158 T.C. No. 1

UNITED STATES TAX COURT

TBL LICENSING LLC f.k.a. THE TIMBERLAND COMPANY, AND
SUBSIDIARIES (A CONSOLIDATED GROUP), Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21146-15.                           Filed January 31, 2022.

F1, a foreign corporation, transferred to F2, its foreign
subsidiary, the sole member interest in DE, an entity disregarded for
Federal tax purposes. DE owned P, a domestic limited liability
company then treated as a corporation for Federal tax purposes. P
owned intangible property, within the meaning of I.R.C.
§ 936(h)(3)(B). P then elected to be disregarded as a separate entity
for Federal tax purposes. P and R agree that F1's transfer of DE to F2
and P's election to be disregarded constituted a "reorganization"
within the meaning of I.R.C. § 368(a)(1)(F) and that, as part of that
reorganization, P constructively transferred intangible property to F2.
For the taxable years 2011 through 2017, US1, a domestic corporation
and indirect parent of F1 and F2, included in its income deemed
annual payments under I.R.C. § 367(d)(2)(A)(ii)(I) attributable to that
constructive transfer.

Held: In order for the operative nonrecognition rules of I.R.C.
§§ 354, 356, and 361 to apply to a reorganization described in I.R.C.

**Served 01/31/22**

§ 368(a)(1)(F), the transaction--however actually effected--should be treated as involving (1) a transfer of the old corporation's assets to the new corporation, in exchange for stock of the new corporation and the new corporation's assumption of any liabilities of the old corporation, and (2) the old corporation's distribution to its shareholders of the stock of the new corporation in cancellation of their stock in the old corporation.

Held, further, the constructive distribution by P to F1 of F2 stock that occurred as part of the reorganization by which F2 acquired P was a "disposition" within the meaning of I.R.C. § 367(d)(2)(A)(ii)(II).

Held, further, P's constructive distribution of F2 stock to F1 necessarily followed the constructive transfer of intangible property by P to F2 that occurred as part of the reorganization; consequently, in the absence of a provision in the regulations to the contrary, P is required to recognize gain in the intangible property under I.R.C. § 367(d)(2)(A)(ii)(II).

Held, further, no provision in the regulations allows reporting of deemed annual payments under I.R.C. § 367(d)(2)(A)(ii)(I) rather than immediate gain recognition under I.R.C. § 367(d)(2)(A)(ii)(II) by reason of P's constructive transfer of intangible property. Because P was no longer recognized as a separate entity for Federal tax purposes after the reorganization, it could not report the deemed annual payments described in I.R.C. § 367(d)(2)(A)(ii)(I), and US1 was neither the U.S. transferor of the intangible property nor the recipient of the FS2 stock.

Held, further, the fair market value of transferred intangible property, for the purpose of determining gain that must be recognized under I.R.C. § 367(d)(2)(A)(ii)(II), should be determined on the basis of the property's entire expected useful life, without regard to the 20-year limit imposed, for some purposes, by Temp. Treas. Reg. § 1.367(d)-1T(c)(3).

James P. Fuller, Kenneth B. Clark, Larissa B. Neumann, Julia V. Ushakova-Stein, and Sean P. McElroy, for petitioner.

John E. Budde, Gretchen A. Kindel, Kimberly B. Tyson, and James M. Cascino, for respondent.

OPINION

HALPERN, Judge: In a notice dated May 11, 2015, respondent advised petitioner that he had determined a deficiency of $504,691,690 in the income tax of the affiliated group of corporations of which petitioner had been the common parent for the group's taxable year ended September 23, 2011. We must decide whether petitioner is required to recognize ordinary income under section 367(d)(2)(A)(ii)(II)[1] as a result of a constructive transfer of intangible property to TBL Investment Holdings GmbH (TBL GmbH), a Swiss corporation, and, if so, whether, in determining the amount of that income, the property should be treated, as a matter of law, as having a useful life limited to 20 years. Each party has

_____

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect for the year in issue, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

moved for summary judgment. In addition, respondent has submitted a motion in limine seeking to exclude stipulations set forth in the parties' stipulations of fact and exhibits offered by petitioner. Respondent has also submitted a motion to strike material included in the memorandum petitioner submitted in support of its motion for summary judgment. For the reasons explained below, we will grant respondent's motion for summary judgment and deny petitioner's motion for summary judgment. Because we conclude that the materials subject to respondent's motion in limine or motion to strike neither demonstrate petitioner's entitlement to summary judgment nor call into question respondent's entitlement to summary judgment, we will deny as moot respondent's motion in limine and motion to strike.

## Background

The events that gave rise to the dispute before us occurred as part of a postacquisition restructuring carried out after a business combination involving VF Corp. (VF) and the Timberland Co. (Timberland). Through its subsidiaries, VF designs, manufactures, and sells apparel and footwear under brands such as Lee, Wrangler, Nautica, Vans, and the North Face. Timberland's business involved the design, development, manufacture, marketing, and sale of footwear, apparel, and accessories under its own brand and others, such as SmartWool.

The VF and Timberland businesses were combined on September 13, 2011, by means of a merger into Timberland of an acquisition subsidiary of TBL International Properties, LLC (International Properties). In the merger, the former Timberland shareholders received cash in exchange for their Timberland stock.

VF had organized International Properties in August 2011 as a limited liability company under Delaware law. The parties have stipulated that International Properties "has been a disregarded entity from the time of its formation."

Petitioner is also a Delaware limited liability company whose sole member interest was owned, throughout the events in issue, by International Properties. The parties have stipulated that "[p]etitioner was treated as a corporation for U.S. federal income tax purposes at all times during the taxable year at issue."

Before the merger in which International Properties acquired Timberland, VF transferred its membership interest in International Properties to VF Enterprises S.à.r.l. (VF Enterprises), an indirect foreign subsidiary of VF. As part of the postacquisition restructuring, petitioner came to own Timberland's intangible property, including trademarks, foreign workforce, and foreign customer relationships.

On September 22, 2011, after the close of the merger by which International Properties acquired the Timberland stock and after petitioner had acquired Timberland's intangible property, VF Enterprises contributed to TBL GmbH the sole member interest in International Properties.[2] About a week later, petitioner elected under Treasury Regulation § 301.7701-3(c)(1)(i) to be disregarded as an entity separate from its owner, effective September 24, 2011.

On the Form 926, Return by a U.S. Transferor of Property to a Foreign Corporation, included with its Federal income tax return for the taxable year ended September 23, 2011, petitioner reported that the trademarks it acquired from Timberland had a fair market value of $1,274,100,000. Respondent assigned the same value to the trademarks in computing the deficiency in issue.

The parties have stipulated that Lee Bell, Inc. (Lee Bell), an indirect domestic subsidiary of VF and indirect parent of VF Enterprises, reported income under section 367(d)(2)(A)(ii)(I) in specified amounts for the taxable years 2011 through 2017. The stipulation does not attribute those amounts to petitioner's constructive transfer of intangible property to TBL GmbH, but the materials the

_____

[2]The record provides no indication that TBL GmbH owned any material assets before it acquired the sole member interest in International Properties. The parties stipulated that VF Enterprises capitalized TBL GmbH with cash equal to "the minimum capital amount for a GmbH under Swiss law."

parties have submitted in support of and opposition to the pending motions for summary judgment demonstrate that each accepts that the inclusions in Lee Bell's income relate to that transfer.[3] The parties also stipulated that Lee Bell never owned the intangible property that petitioner constructively transferred to TBL GmbH.

## Discussion

### I. Introduction

Petitioner and respondent agree that, in the restructuring that followed the acquisition of Timberland by VF Enterprises, through International Properties,[4]

---

[3]For example, respondent acknowledges that the income reported by Lee Bell is "attributable to the IP." And petitioner states that Lee Bell included deemed annual payments in income "[a]s a result of the Outbound F Reorganization" by which TBL GmbH acquired petitioner.

[4]The parties apparently disagree as to how the Timberland acquisition was financed. In the memorandum it submitted in support of its motion for summary judgment, petitioner proposed a finding of fact that VF Enterprises "funded the acquisition of Timberland from existing sources of cash, collecting receivables, and through related party borrowings." Respondent objects to petitioner's proposed finding. Respondent alleges that VF was the ultimate source of the funds VF Enterprises used to acquire Timberland. And the materials petitioner cites in support of its proposed finding are among those covered by respondent's motion in limine and motion to strike. Respondent's principal policy objection to the transaction in issue, however, seems to be that, in his view, the transaction involved the use of "untaxed foreign earnings and profits to acquire an unrelated domestic target." We see no respect in which the application of section 367(d) to the transaction should turn on whether it occurred as part of a larger transaction

petitioner came to own Timberland's intangible property and then made a constructive transfer of that property to TBL GmbH, a subsidiary of VF Enterprises. They agree that petitioner's constructive transfer of intangible property occurred as part of a "reorganization" described in section 368(a)(1)(F). And they agree that, because petitioner--then treated as a U.S. corporation--constructively transferred intangible property to a foreign corporation in a transaction that would otherwise qualify for nonrecognition treatment under section 361(a), section 367(d) applies to the transfer. The parties disagree, however, on the consequences of section 367(d)'s application.

The rules of section 367 provide an overlay to the corporate nonrecognition provisions found in subchapter C of subtitle A, chapter 1 of the Code. When one of the parties to a transaction is a foreign corporation, affording the transaction the same nonrecognition treatment it would receive if the parties were domestic could

_____

that may have involved a tax-free repatriation of foreign earnings. In any event, if VF was the ultimate source of the funds used to acquire Timberland, as respondent alleges, we do not see how the transaction could be viewed as having effected a repatriation of earnings of VF Enterprises that had not previously been subject to U.S. tax. More generally, each party's motion for summary judgment necessarily rests on the premise that the case presents "no genuine dispute as to any material fact." Rule 121(b). Therefore, each party has implicitly represented that any factual dispute concerning the source of the funds VF Enterprises used to acquire Timberland is not material to the legal issue before us. And we, as well, see no respect in which the financing of the acquisition would affect the question of how section 367(d) applies to the transaction in issue.

lead to inappropriate results. When foreign corporations are involved, property can move in and out of the U.S. tax jurisdiction. Reflecting those changes in status requires adjustments to the normal nonrecognition rules. In particular, a U.S. person who makes an "outbound" transfer of property to a foreign corporation might be required to recognize gain even if, had the transfer been made to a U.S. corporation, it would have been entitled to nonrecognition treatment. Section 367(a), which applies to outbound transfers of most types of property, achieves that result by providing, subject to significant exceptions, that the foreign corporation that receives the property is not treated as a corporation. Outbound transfers of intangible property are not covered by section 367(a) but are instead addressed by section 367(d). Section 367(d) generally requires the U.S. transferor of intangible property to recognize gain in the form of ordinary income, but the timing of that income recognition varies depending on the circumstances. The principal dispute between the parties centers on the timing of the income recognition required by section 367(d).

II.    Recharacterizing the Transaction

The parties' disagreement concerning the effect of section 367(d) turns, in part, on the proper characterization of the larger transaction of which petitioner's constructive transfer of intangible property was a part. The parties agree that the

actual transaction should be recharacterized for Federal income tax purposes but disagree on how. Therefore, we begin our analysis by describing the actual transaction and deciding on the appropriate recharacterization.

### A. The Actual Transaction

The actual events that gave rise to petitioner's constructive transfer of intangible property were quite simple. First, VF Enterprises, an indirect foreign subsidiary of VF, contributed to TBL GmbH, its own foreign subsidiary, the sole member interest in International Properties. At that time, International Properties owned the sole member interest in petitioner, and petitioner owned assets, including intangible property, that it had acquired from Timberland. Petitioner then elected to be disregarded as an entity separate from its owner, International Properties (which, in turn, was disregarded as an entity separate from TBL GmbH). That is the extent of the actual events that gave rise to the dispute before us. Those events did not include a transfer of intangible property. Upon the completion of those events, petitioner continued to own the Timberland intangible property. Yet, the parties agree that petitioner should be treated as having made a transfer of intangible property to which section 367(d) applies. Therefore, both parties accept that the actual transaction must be recharacterized in some fashion.

Adding further complexity, the necessary recharacterization must proceed in stages. The first stage takes into account various fictions resulting from application of the entity classification regulations.

B.     Impact of the Entity Classification Regulations

As a domestic "eligible entity" with a single owner, International Properties would have been classified as a disregarded entity unless it had made an election to be classified as a corporation.[5] See Treas. Reg. § 301.7701-3(b)(1)(ii). We infer from the parties' stipulation that International Properties has always been disregarded that it made no election to be classified as a corporation.

As a domestic eligible entity, petitioner would have been classified, in the absence of an election to the contrary, as either a partnership or a disregarded entity, depending on the number of its owners. Id. subpara. (1). We thus infer from the parties' stipulation that petitioner was treated as a corporation throughout the taxable year in issue (ended September 23, 2011) that petitioner initially filed

---

[5]The regulations use the term "eligible entity" to refer to a "business entity" other than a state law corporation or other entity that is required to be classified as a corporation for Federal tax purposes. Treas. Reg. § 301.7701-3(a). An entity is a business entity if it is recognized for Federal tax purposes and not classified as a trust "or otherwise subject to special treatment under the Internal Revenue Code." Treas. Reg. § 301.7701-2(a). Thus, limited liability companies like International Properties are generally eligible entities.

an election under Treasury Regulation § 301.7701-3(c)(1)(i) to be classified as an "association" (and thus as a corporation). See Treas. Reg. § 301.7701-2(b)(2) (including within the definition of "corporation" any "association (as determined under § 301.7701-3)").

Because International Properties was disregarded as an entity separate from its owner and petitioner was, on September 22, 2011, classified as a corporation, VF Enterprises' contribution to TBL GmbH of the sole member interest in International Properties should be treated, in the first instance, as a contribution of "stock" in petitioner.

Next, we consider the effects of what we infer to have been petitioner's second entity classification election: the election that became effective on September 24, 2011, to be disregarded as an entity separate from its owner. As a general matter, an eligible entity cannot make more than one entity classification election every five years. Treas. Reg. § 301.7701-3(c)(1)(iv). That limitation, however, does not apply to "[a]n election by a newly formed eligible entity that is effective on the date of formation." Id. Because the parties accept the validity of petitioner's election to be a disregarded entity, we assume that its prior classification as a corporation resulted from an election that was effective on the date of its formation.

The regulations provide a series of constructs to explain an entity's change in classification for Federal tax purposes. Treasury Regulation § 301.7701-3(g)(1)(iii) supplies the construct for cases in which an entity with a single owner that had been classified as an association elects to be disregarded. In that event, "the following is deemed to occur: The association distributes all of its assets and liabilities to its single owner in liquidation of the association." Treas. Reg. § 301.7701-3(g)(1)(iii).

Taking into account only the constructs required to explain the Federal tax classifications of the participating entities, the actual transaction would be recharacterized as a (1) contribution by VF Enterprises to TBL GmbH of the stock of petitioner (then a corporation), followed by (2) petitioner's distribution of all of its assets and liabilities to TBL GmbH in liquidation. Under that construct, petitioner would be treated as having transferred intangible property. But that transfer--a liquidating distribution to TBL GmbH--would not have been a transfer to which section 367(d) applies. Section 367(d) applies to a transfer of intangible property by a U.S. person to a foreign corporation only if the transfer takes the form of "an exchange described in section 351 or 361." For an exchange to be described in section 351 or 361, it must be a transfer of property in exchange--at least in part--for stock of the recipient. Under the construct supplied by the entity

classification regulations, petitioner would not be treated as having received TBL

GmbH stock in exchange for the transferred intangible property. Instead,

petitioner would be treated as having distributed the intangible property in

liquidation--in cancellation of its own stock. Because the parties agree that

petitioner made a transfer of intangible property to which section 367(d) applies, it

follows that our recharacterization of the actual transfer remains incomplete.

C.      Further Recharacterization Under the Reorganization Rules

The next stage of recharacterization results from the application of the

reorganization rules to the transactions imputed under the entity classification

regulations. The parties stipulated that "[t]he contribution by VF Enterprises

S.à.r.l. of TBL International Properties LLC to TBL Investment Holdings GmbH

. . . combined with the check-the-box election for Petitioner to be treated as a

disregarded entity . . . was an F reorganization under Section 368(a)(1)(F)."

Section 368(a)(1)(F) includes within the definition of "reorganization" "a mere

change in identity, form, or place of organization of one corporation, however

effected." In 2015, the Treasury Department issued regulations that elaborate on

that sparse statutory definition. Treas. Reg. § 1.368-2(m). By its terms, however,

paragraph (m) of Treasury Regulation § 1.368-2 "applies to transactions occurring

on or after September 21, 2015." Id. subpara. (5). The regulations thus do not

apply to the transaction in issue.  For periods before the current regulations were effective, elaboration on the statutory definition was left to the courts.  One leading case stated:

> Although the exact function and scope of the (F) reorganization in the scheme of tax-deferred transactions described in section 368(a)(1) have never been clearly defined, it is apparent from the language of subparagraph (F) that it is distinguishable from the five preceding types of reorganizations as encompassing only the simplest and least significant of corporate changes.  The (F)-type reorganization presumes that the surviving corporation is the same corporation as the predecessor in every respect, except for minor or technical differences. . . .  For instance, the (F) reorganization typically has been understood to comprehend only such insignificant modifications as the reincorporation of the same corporate business with the same assets and the same stockholders surviving under a new charter either in the same or in a different State, the renewal of a corporate charter having a limited life, or the conversion of a U.S.-chartered savings and loan association to a State-chartered institution.
>
> The decisions involving subparagraph (F) or its counterpart in prior revenue acts consistently have imposed at least one major limitation on transactions that have been claimed to qualify thereunder:  if a change in stock ownership or a shift in proprietary interest occurs, the transaction will fail to qualify as an (F) reorganization. . . .

Berghash v. Commissioner, 43 T.C. 743, 752 (1965) (footnote omitted), aff'd, 361 F.2d 257 (2d Cir. 1966).

The parties' stipulation that VF Enterprises' contribution to TBL GmbH of the sole member interest in International Properties and petitioner's election to be a disregarded entity resulted in a reorganization described in section 368(a)(1)(F) is

consistent with the caselaw interpreting that section. Accordingly, we see no reason to set aside the parties' stipulation. TBL GmbH emerged from the construct imposed by the entity classification regulations as "the same corporation" as petitioner "except for minor or technical differences." Id. VF Enterprises' transfer to TBL GmbH of the stock of petitioner and the deemed liquidation of petitioner into TBL GmbH simply "reincorporat[ed]" petitioner's business. Id. After the transactions, TBL GmbH owned "the same assets" and had "the same stockholder[]" as petitioner. Id. Petitioner's business survived in a new legal form, incorporated in Switzerland rather than Delaware.

That the constructive transactions resulting from the application of the entity classification regulations effected a reorganization described in section 368(a)(1)(F) requires further recharacterization. Section 368(a) is only a definitional provision; it describes those transactions that qualify as reorganizations but does not itself prescribe their tax consequences. The operative rules are found elsewhere. Sections 354 and 356 provide nonrecognition treatment, in whole or in part, at the shareholder level, and section 361 provides nonrecognition treatment at the corporate level. Fitting an F reorganization within the operative nonrecognition rules requires that the transaction--however actually effected--be treated as a transfer of assets by the old corporation to the new in exchange for

stock of the new corporation and the old corporation's distribution of that stock to its shareholders. Under that construct, the old corporation's asset transfer will qualify for nonrecognition treatment under section 361(a) and the stock distribution will qualify for nonrecognition treatment under section 361(c).[6] The shareholders' exchange of stock of the old corporation for that of the new will receive nonrecognition treatment under section 354(a).[7]

Treasury Regulation § 1.367(a)-1(f) confirms that the above construct applies at least to those reorganizations described in section 368(a)(1)(F) in which "the transferor corporation is a domestic corporation, and the acquiring corporation is a foreign corporation." In those circumstances

---

[6]Section 361(a) provides: "No gain or loss shall be recognized to a corporation if such corporation is a party to a reorganization and exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization." Under section 361(c), a corporation that is a party to a reorganization does not recognize gain or loss on a distribution of "qualified property" in pursuance of the plan of reorganization. For purposes of section 361(c), the term "qualified property" includes "any stock in (or right to acquire stock in) another corporation which is a party to the reorganization . . . if such stock (or right) . . . is received by the distributing corporation in the exchange." § 361(c)(2)(B)(ii).

[7]Section 354(a) provides: "No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities . . . in another corporation a party to the reorganization."

there is considered to exist--

      (i) A transfer of assets by the transferor corporation to the acquiring corporation under section 361(a) in exchange for stock (or stock and securities) of the acquiring corporation and the assumption by the acquiring corporation of the transferor corporation's liabilities;

      (ii) A distribution of the stock (or stock and securities) of the acquiring corporation by the transferor corporation to the shareholders (or shareholders and security holders) of the transferor corporation; and

      (iii) An exchange by the transferor corporation's shareholders (or shareholders and security holders) of their stock (or stock and securities) of the transferor corporation for stock (or stock and securities) of the acquiring corporation under section 354(a).

Treas. Reg. § 1.367(a)-1(f)(1).

Although the Treasury Department adopted the rule quoted above in final form in September 2015, T.D. 9739, 2015-41 I.R.B. 528, the rule applies "to transactions occurring on or after January 1, 1985," Treas. Reg. § 1.367(a)-1(g)(4). The rule first appeared in proposed and temporary regulations issued in January 1990. T.D. 8280, 1990-1 C.B. 80.

The preamble to the 1990 temporary regulations states that they were intended to "clarify" that reorganizations described in section 368(a)(1)(F) include "exchanges under sections 354(a) and 361(a)." Id. at 80. The Treasury Department provided the guidance "to apprise taxpayers of the transfers occurring in a reorganization and to prevent tax avoidance in these transactions." Id.

As explained above, the construct described in Treasury Regulation § 1.367(a)-1(f) would be necessary, regardless of the jurisdictions in which the parties are incorporated, to allow for the application to the transaction of the operative nonrecognition rules provided in sections 354 and 361. Taxpayers would have no apparent incentive to argue for an alternative construct. Any construct that would avoid a section 367 transfer would also avoid a section 361(a) exchange, thereby calling into question the eligibility of the transaction for nonrecognition treatment in the first instance. The parties involved in an outbound F reorganization, however, might have argued that their transaction, having effected "only the simplest and least significant of corporate changes," Berghash, 43 T.C. at 752, did not involve any transfers or distributions at all--that the reorganization was a nonevent. Treasury Regulation § 1.367(a)-1(f) forecloses any such argument.[8]

---

[8]An argument that an outbound F reorganization involves no actual or constructive exchanges or distributions would have been difficult to sustain in any event in the face of United States v. Phellis, 257 U.S. 156 (1921), and Marr v. United States, 268 U.S. 536 (1925). In those cases, the Supreme Court concluded that participating shareholders recognized income or gain from transactions in which New Jersey corporations reincorporated in Delaware. As Justice Brandeis observed in Marr, 268 U.S. at 541: "[T]he new corporation is essentially different from the old. A corporation organized under the laws of Delaware does not have the same rights and powers as one organized under the laws of New Jersey." If a New Jersey corporation is "essentially different" from a Delaware corporation, so

Respondent relies on Treasury Regulation § 1.367(a)-1(f) to establish that the constructive events that the parties agree constituted an F reorganization included a distribution of TBL GmbH stock by petitioner to VF Enterprises. Petitioner describes respondent's reliance on that regulation as "erroneous[]." According to petitioner, "Treas. Reg. § 1.367(a)-1 applies to § 367(a), not § 367(d) or the § 367(d) Regulations."[9]

_____

that a reincorporation from one state to the other would be a taxable transaction in the absence of an applicable nonrecognition rule, then, a fortiori, a Swiss corporation cannot be viewed as the same entity as a Delaware corporation (much less a Delaware limited liability company that has elected, for Federal tax purposes, to be treated as a corporation). A year after the issuance of the 1990 proposed and temporary regulations, the Court relied on Phellis and Marr to hold that "an exchange of property gives rise to a realization event so long as the exchanged properties are 'materially different'--that is, so long as they embody legally distinct entitlements." Cottage Sav. Ass'n v. Commissioner, 499 U.S. 554, 566 (1991).

[9]Petitioner's submissions display a marked penchant for defined terms, demonstrated by the four-page glossary included with its motion for summary judgment. Petitioner's glossary defines "§ 367(d) Regulations" as "Temp. Treas. Reg. § 1.367(d)-1T that was in effect throughout the calendar year 2011." Respondent purports to "object[]" to petitioner's use of its own defined terms "on the ground that they are not neutral terms with neutral definitions to assist the reader, but rather carry embedded interpretations or connotations which skew their meaning." To the extent that our quotations of petitioner's arguments include petitioner's own defined terms, we intend those quotations only to indicate what petitioner argues. We recognize that the definitions petitioner offers of the terms of its own creation, like the arguments of parties generally, may not be "neutral."

Petitioner's position, as we understand it, rests on paragraph (a) of Temporary Treasury Regulation § 1.367(a)-1T (captioned "Purpose and scope of regulations"), as adopted in 1986. Temporary Treasury Regulation § 1.367(a)-1T(a), when initially adopted, began as follows: "These regulations set forth rules relating to the provisions of section 367(a) concerning certain transfers of property to foreign corporations. This § 1.367(a)-1T provides general rules explaining the effect of section 367(a)(1) and describing the transfers of property that are subject to the rule of that section." T.D. 8087, 1986-1 C.B. 175, 177. When the Treasury Department added paragraph (f) to Temporary Treasury Regulation § 1.367(a)-1T in 1990, it did not revise paragraph (a). T.D. 8280, 1990-1 C.B. at 82. Therefore, petitioner apparently reasons, the rule that now appears in Treasury Regulation § 1.367(a)-1(f), when initially adopted, applied only for the purpose of implementing section 367(a) and had no application to section 367(d). And when the rule was adopted in its current form, the Treasury Department did not indicate an intent to broaden the provision's scope.

From a narrow, technical standpoint, petitioner's argument might have some merit. But the argument raises difficult questions that petitioner neither addresses nor even acknowledges. As noted above, the Treasury Department added paragraph (f) to Temporary Treasury Regulation § 1.367(a)-1T "to prevent tax

avoidance" in outbound F reorganizations. T.D. 8280, 1990-1 C.B. at 80. The preamble to the 1990 amendments did not limit their purpose to preventing the avoidance of section 367(a). We can think of no reason why concerns about tax avoidance in outbound F reorganizations would be limited to those involving tangible property. Moreover, as respondent observes, petitioner's argument suggests that its transfer of intangible property was governed by a construct different from that applicable to its transfer of other property. Petitioner offers no explanation for why and how an outbound F reorganization would be treated as having been effected by two different and contrary constructs.

Even if we were to leave policy considerations (and perhaps common sense) aside and accept petitioner's technical argument that the construct provided in Treasury Regulation § 1.367(a)-1(f) does not apply to the F reorganization in issue, we would need to identify an alternative construct to explain the transaction. That construct would necessarily include an asset transfer described in section 361(a). (Otherwise, section 367(d) would not apply to the transaction in the first place.) Thus, petitioner would necessarily be treated as having transferred its intangible property to TBL GmbH in exchange for TBL GmbH stock. Upon the completion of the transaction, however, petitioner no longer owned any TBL GmbH stock. In fact, petitioner was no longer recognized as a corporation or any other type of

entity for Federal tax purposes. As a result of its second entity classification election, petitioner was disregarded as an entity separate from TBL GmbH. Upon completion of the transaction, VF Enterprises owned all of the TBL GmbH stock. Therefore, any TBL GmbH stock constructively issued to petitioner must have found its way--by some means--to VF Enterprises. The circumstances do not allow for treating petitioner as having received consideration in exchange for the TBL GmbH stock that ended up with VF Enterprises. It follows that petitioner's constructive disposition of that stock necessarily took the form of a distribution by petitioner to VF Enterprises in respect of the stock of petitioner that VF Enterprises was treated as having owned while petitioner was classified as a corporation. If that distribution was not "in pursuance of the plan of reorganization," and therefore not covered by section 361(c), petitioner would have recognized gain on the distribution in an amount equal to the gain in the property it constructively transferred to TBL GmbH. See § 311(b) (requiring recognition of gain on distributions by a corporation of appreciated property), § 358(a)(1) (providing as a general rule that the basis of nonrecognition property received in a section 361 exchange equals the basis of the property exchanged).

On balance, we find unpersuasive petitioner's argument about the scope of Treasury Regulation § 1.367(a)-1(f). Treasury Regulation § 1.367(a)-1(a) provides:

> Section 367(a)(1) provides the general rule concerning transfers of property by a United States person . . . to a foreign corporation. Paragraph (b) of this section provides general rules explaining the effect of section 367(a)(1). Paragraph (c) of this section describes transfers of property that are described in section 367(a)(1). Paragraph (d) of this section provides definitions that apply for purposes of sections 367(a) and (d) and the regulations thereunder. Paragraphs (e) and (f) of this section provide rules that apply to certain reorganizations described in section 368(a)(1)(F). Paragraph (g) of this section provides dates of applicability. For rules concerning the reporting requirements under section 6038B for certain transfers of property to a foreign corporation, see § 1.6038B-1.

While paragraphs (b) and (c) of Treasury Regulation § 1.367(a)-1 are limited to the interpretation of section 367(a), no such limitation applies to paragraph (f). Even if petitioner were correct that Temporary Treasury Regulation § 1.367(a)-1T(f) applied only for the purpose of implementing section 367(a), that temporary provision expired three years after its issuance. See § 7805(e)(2). Petitioner's transaction is governed not by the expired temporary provision but by the provision proposed in 1990 and adopted in final form in 2015. We reject as contrary to the stated purpose of the provision any inference that might otherwise be drawn from the failure to amend Temporary Treasury Regulation § 1.367(a)-

1T(a) when the provision in question was initially adopted as paragraph (f) of that same regulation.[10]

In any event, we do not regard the applicability of Treasury Regulation § 1.367(a)-1(f) as dispositive. As we read that provision, it simply clarifies that the construct that necessarily applies to an F reorganization to allow for the application of the operative nonrecognition provisions of sections 354 and 361 applies without regard to whether the transaction is "inbound, outbound, [or] foreign to foreign." T.D. 8280, 1990-1 C.B. at 80. To ensure that the operative nonrecognition provisions apply, we would characterize the transaction that the parties agree to

_____

[10]Petitioner has no cause for complaint about the retroactive effect of Treasury Regulation § 1.367(a)-1(f). Until a 1996 amendment of section 7805(b), regulations generally applied retroactively unless the Secretary of the Treasury exercised his discretion to apply them prospectively. As amended in 1996, section 7805(b) limits the extent to which regulations can apply retroactively. The amendment, however, applies only to regulations that relate to statutory provisions enacted on or after July 30, 1996. Taxpayer Bill of Rights 2, Pub. L. No. 104-168, § 1101(b), 110 Stat. 1452, 1469. While Congress has amended section 367(d) several times since July 30, 1996, those amendments have no apparent bearing on the issue before us. Therefore, it is not clear whether the 1996 amendment of section 7805(b) limits the extent to which Treasury Regulation § 1.367(a)-1(f) can be applied retroactively. Moreover, respondent's application of Treasury Regulation § 1.367(a)-1(f) to the transaction in issue would not violate section 7805(b) even if that provision, in its current form, were applicable. The statute allows regulations to apply retroactively back to "the date on which any proposed or temporary regulation to which such final regulation relates was filed with the Federal Register." § 7805(b)(1)(B).

have been an F reorganization as involving both a transfer of property described in section 361(a) and a distribution of the stock of the acquiring corporation described in section 361(c). We would apply that construct regardless of whether Treasury Regulation § 1.367(a)-1(f) directs us to do so.

We thus need not address petitioner's argument that the circumstances surrounding the adoption of Treasury Regulation § 1.367(a)-1(f) require us to disregard it. Petitioner contends that "[t]he facts here lead to the reasonable inference that Respondent finalized Treas. Reg. § 1.367(a)-1 to support his argument that Treas. Reg. § 1.367(a)-1(f) applies in this case." On the basis of such an inference, petitioner argues that "Respondent's interpretation and application of Treas. Reg. § 1.367(a)-1(f) to the transaction at issue is therefore a litigating position that should be disregarded." In support of that argument, petitioner seeks to submit two sets of materials that are covered by respondent's motion in limine and motion to strike. First, petitioner proffered materials from the legal file relating to the adoption of Treasury Regulation § 1.367(a)-1(f) that it received in response to requests made under the Freedom of Information Act (FOIA). Second, petitioner seeks to submit the annual priority guidance plans for 2010-2011 through 2017-2018 published by the Treasury Department's Office of Tax Policy and the Internal Revenue Service (IRS).

It is perhaps unsurprising that petitioner is unable to point to any material obtained in response to its FOIA requests that acknowledges that respondent's schedule in adopting Treasury Regulation § 1.367(a)-1(f) was motivated by an effort to improve his position in the case before us. Petitioner's only citation of that material in the arguments it advanced concerning the motions for summary judgment is to a "Case History" that states that the "case" (relating to the regulation project) was opened on May 15, 2015--four days after respondent issued the notice of deficiency in the present case. From that coincidence in timing, petitioner surmises that "Respondent was developing his litigation position . . . [when] he began the process for finalizing Treas. Reg. § 1.367(a)-1(f)." And on the basis of that surmise, petitioner then infers that respondent's purpose in adopting the regulation in final form when he did was to bolster his litigating position in the present case.

In his motion in limine, respondent observes that petitioner did not cite the so-called business plans in the memorandum it submitted in support of its motion for summary judgment. In its opposition to respondent's motion in limine, petitioner advised us that those documents are relevant, in its view, because of respondent's reliance on Treasury Regulation § 1.367(a)-1(f). Petitioner observes that "Treas. Reg. § 1.367(a)-1(f) was not on the IRS Priority Guidance Plan

between 2010 and 2016." Thus, the annual business plans for that period, petitioner suggests, "help confirm that the three decades late, retroactive, and surprising finalization of Treas. Reg. § 1.367(a)-1(f) in the course of this litigation was not an ordinary, planned event."

The mere coincidence in timing between the initiation of the present case and the adoption in final form of Treasury Regulation § 1.367(a)-1(f) hardly establishes that the agency's purpose in finalizing the regulation when it did was to bolster its position in the case before us. Moreover, the rule had been proposed in 1990--long before petitioner engaged in the transaction in issue.

In any event, for the reasons explained above, our conclusion that the F reorganization included a constructive distribution of TBL GmbH stock does not depend on Treasury Regulation § 1.367(a)-1(f). Consequently, we need not address further petitioner's argument concerning the circumstances that precipitated the adoption of the regulation in final form.

D.     Conclusion:  Result of Recharacterization

We conclude that VF Enterprises' transfer to TBL GmbH of the sole member interest in International Properties and petitioner's election to be disregarded as an entity separate from TBL GmbH effected a reorganization described in section 368(a)(1)(F). As part of that reorganization, petitioner should

be treated as having transferred its intangible and other properties to TBL GmbH in exchange for TBL GmbH stock and as having distributed that TBL GmbH stock to VF Enterprises in cancellation of the stock VF Enterprises had been treated as holding in petitioner during the time that petitioner was classified as a corporation for Federal tax purposes. We now turn to the question of how section 367(d) applies to those constructive transactions.

III.    Application of Section 367(d)

Section 367(d)(1) applies, "[e]xcept as provided in regulations . . . if a United States person transfers any intangible property (within the meaning of section 936(h)(3)(B)) to a foreign corporation in an exchange described in section 351 or 361." § 367(d)(1). The parties agree that petitioner's constructive transfer of property to TBL GmbH as part of the F reorganization was subject to section 367(d). Thus, the parties apparently agree that petitioner was a United States person, that the property petitioner constructively transferred to TBL GmbH in the F reorganization included intangible property, within the meaning of section 936(h)(3)(B), and that the transfer was an exchange described in section 361.

When section 367(d)(1) applies to a transfer,

the United States person transferring . . . [the intangible] property . . . [is] treated as--

(i) having sold such property in exchange for payments which are contingent upon the productivity, use, or disposition of such property, and

(ii) receiving amounts which reasonably reflect the amounts which would have been received--

(I) annually in the form of such payments over the useful life of such property, or

(II) in the case of a disposition following such transfer (whether direct or indirect), at the time of the disposition.

§ 367(d)(2)(A). Section 367(d)(2)(C) provides: "For purposes of this chapter, any amount included in gross income by reason of this subsection shall be treated as ordinary income. For purposes of applying section 904(d) [related to the foreign tax credit], any such amount shall be treated in the same manner as if such amount were a royalty."

Given the parties' agreement on the application of section 367(d), it follows that they agree that petitioner is treated under section 367(d)(2)(A)(i) as having sold its intangible property for one or more contingent payments. Their disagreement centers on when petitioner should be treated as having received payment and thus when the resulting income should be recognized. The answer to that question turns on which of the two subclauses of section 367(d)(2)(A)(ii)

applies.[11]  Respondent argues that subclause (II) applies, with the result that petitioner recognized all of the income from its deemed sale of intangible property for the taxable year in issue.  Petitioner disputes the application of the immediate gain recognition rule provided in that subclause.

A.  Did a "Disposition" Occur?

Subclause (II) applies only in the event of a "disposition following [the] transfer" of intangible property.  Respondent argues that petitioner's constructive distribution to VF Enterprises of the stock of TBL GmbH that it (constructively) received in exchange for its intangible property was a "disposition" within the meaning of subclause (II).  In support of his position, respondent invokes the conference report on the Deficit Reduction Act of 1984, which states the conferees' intent "that disposition of (1) the transferred intangible by a transferee corporation, or (2) the transferor's interest in the transferee corporation will result

---

[11]Respondent accepts the framing of the issue presented in the text, but petitioner does not.  Respondent describes the parties' dispute as being "over which rule of section 367(d)(2)(A)(ii) applies."  That is how we see the dispute as well.  Petitioner, however, contends that respondent's "statement of the issue . . . is an apparent attempt to dodge . . . specific provisions" in the applicable regulations.  Petitioner suggests that the analysis should "start[] with" the regulations, rather than the statute that those regulations serve to interpret.  Petitioner's reframing of the issue, however, would have no apparent consequence.  Even if we were to start our analysis with the regulations, that analysis would be incomplete without considering the statute as well.

in recognition of U.S.-source ordinary income to the original transferor." H.R. Rep. No. 98-861, at 955 (1984) (Conf. Rep.). As respondent reads the conference report, it establishes that, when subclause (II) refers to a "direct disposition," it means "a disposition of the IP [intangible property] itself by the transferee foreign corporation," and its reference to "indirect" dispositions encompasses "a disposition by the domestic corporation of an interest in, i.e., the stock of, the transferee foreign corporation that owns the IP."

Although petitioner alludes to the prospect that any distribution of TBL GmbH stock deemed to have occurred as part of the reorganization was not a "disposition" within the meaning of section 367(d)(2)(A)(ii)(II), it does not develop a coherent argument to that effect. Petitioner suggests that "[t]he deemed distribution is a constructive transaction that occurs only for purposes of applying certain reorganization rules." Petitioner offers no explanation, however, for why the constructive distribution should be taken into account in applying section 361(c) but not section 367(d). In fact, the deemed transfer of intangible property that petitioner accepts as the basis for section 367(d)'s application was just as much a construct of the reorganization rules as the deemed distribution. We see no reason to take one aspect of the reorganization construct into account in applying section 367(d) but not the other.

We agree with respondent's reading of the 1984 conference report and conclude, in the absence of any credible argument to the contrary, that petitioner's constructive distribution to VF Enterprises of the stock of TBL GmbH, the transferee foreign corporation, was a "disposition" within the meaning of section 367(d)(2)(A)(ii)(II).

B.     Did the Disposition "Follow" the Section 367(d) Transfer?

We next take up the question of whether the disposition "followed" the section 367(d) transfer.  Petitioner accuses respondent of "slic[ing]" the F reorganization "into its component parts . . . so that there is first a deemed asset transfer of the IP and then there is a separate, subsequent deemed indirect disposition of that same intangible property in the same reorganization transaction."  Relying on the step transaction doctrine, petitioner asserts that, because any deemed distribution of TBL GmbH stock was, along with the section 367(d) transfer, part of a single reorganization, both steps should be treated as having occurred simultaneously.

We are unpersuaded by petitioner's step transaction argument.  That the asset transfer and stock distribution were elements of a single overall reorganization does not require treating them as having occurred in precise simultaneity.  As respondent observes, petitioner cannot have distributed the stock

it received in exchange for its intangible property until it first received that stock: Its constructive exchange of intangible property for TBL GmbH stock necessarily preceded--if only by a moment--its distribution of that stock to VF Enterprises.[12] The stock distribution might not have "follow[ed]" the transfer of intangible property by much, but, as a matter of logic, it had to "follow[]."[13]

The principal authority petitioner relies on in support of its step transaction argument, Commissioner v. Clark, 489 U.S. 726 (1989), is readily distinguishable from the present case. Clark involved the question of whether a shareholder's receipt of cash "boot" in a reorganization "ha[d] the effect of the distribution of a dividend" and thus should have been taxed as ordinary income rather than capital

---

[12]Petitioner accuses respondent of "conflat[ing] a deemed distribution with an actual distribution." "If a deemed event is created," petitioner reasons, "there is nothing illogical or improper about providing for simultaneity." We question the appropriateness of deeming circumstances whose actual occurrence would be impossible. Moreover, petitioner's reasoning would draw an unjustifiable distinction among F reorganizations depending on the manner in which they were implemented.

[13]We therefore view it as being of no moment that, as petitioner observes, "Treas. Reg. § 1.367(a)-1(f) . . . does not contain a timing sequence for when the distribution is deemed to occur." The relative timing of the three steps in the construct adopted in the regulation to explain an outbound F reorganization was apparently unimportant to the drafters of the regulation. Therefore, the regulation states only that the three components are "considered to exist." Id. But we need not rely on the specific terms of the regulation for the proposition that the U.S. transferor's distribution of stock of the transferee foreign corporation necessarily follows its receipt of that stock in exchange for the transferred intangible property.

gain. See § 356(a)(2). The taxpayer in Clark had been the sole shareholder of Basin Surveys, Inc. (Basin). N.L. Industries, Inc. (NL), acquired Basin by means of a merger of Basin into an acquisition subsidiary of NL (a "forward triangular merger"). The taxpayer received both NL stock and cash in exchange for his Basin stock.

The Court reasoned that the question of whether the boot the taxpayer received was equivalent to a dividend "should be answered by examining the effect of the exchange as a whole." Commissioner v. Clark, 489 U.S. at 737. The Court found support for its reading of the statute in the "well-established 'step-transaction' doctrine." Id. at 738. It described that doctrine as providing that "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." Id.

Because it concluded that the characterization of the boot had to be made looking at the overall transaction, the Court rejected the Commissioner's analogy to a cash distribution before the reorganization. Had the taxpayer received the cash in redemption of part of his stock in the target corporation before the reorganization, his receipt of the cash would have been equivalent to a dividend because it would not have reduced his proportionate ownership of the target. The taxpayer would have owned fewer shares in the target but would still have owned

100% of the target's stock.  See § 302(d) (treating redemptions not qualifying for exchange treatment under section 302(a) and (b) as distributions in respect of stock); United States v. Davis, 397 U.S. 301, 307 (1970) (holding that a redemption of stock from a sole shareholder is always equivalent to a dividend).  As the Court explained in Clark:

> Viewing the exchange in this case as an integrated whole, we are unable to accept the Commissioner's prereorganization analogy.  The analogy severs the payment of boot from the context of the reorganization.  Indeed, only by straining to abstract the payment of boot from the context of the overall exchange, and thus imagining that Basin made a distribution to the taxpayer independently of NL's planned acquisition, can we reach the rather counterintuitive conclusion urged by the Commissioner--that the taxpayer suffered no meaningful reduction in his ownership interest as a result of the cash payment. . . .

Commissioner v. Clark, 489 U.S. at 738.  Measuring the effect of the taxpayer's receipt of cash by the extent to which it required him to forgo an increased proportionate interest in NL, the Court concluded that the taxpayer was not required to recognize ordinary income as a result of his receipt of boot.

Respondent's position in the case before us is not contrary to Clark.  Respondent accepts that petitioner's section 361(a) transfer of intangible property and its section 361(c) distribution of the stock it received in exchange for that property occurred as part of an overall reorganization.  Respondent is hardly considering the asset transfer and stock distribution separately.  Indeed, respondent

has determined the tax consequences of petitioner's constructive transfer of intangible property taking into account the distribution of TBL GmbH stock that occurred as part of the same overall transaction. He simply recognizes that, as a logical matter, petitioner's receipt of the TBL GmbH stock in exchange for the transferred intangible property was a precondition to its distribution of that stock to VF Enterprises. The distribution could not have occurred until the exchange of property for stock had been completed: One cannot distribute what one does not have. Characterizing one step by reference to other steps that occur as part of a larger transaction does not require viewing the steps as having occurred simultaneously. Nothing in <u>Clark</u> suggests otherwise.[14]

Petitioner also invokes Treasury Regulation § 301.7701-3(g)(3)(i) in support of its claim that "[t]he Outbound F Reorganization[15] and its deemed component parts . . . all occurred <u>simultaneously</u>." That section provides: "Any transactions that are deemed to occur under this paragraph (g) as a result of a change in

---

[14]<u>Clark</u> raised no issue of temporal sequence: It involved a single exchange of Basin stock for NL stock and cash.

[15]In regard to the term "Outbound F Reorganization," petitioner's glossary states: "TBL (Petitioner) was reorganized into TBL GmbH, a Swiss controlled foreign corporation within the VF Controlled Group, in an outbound § 368(a)(1)(F) reorganization transaction." Regarding "VF Controlled Group," the glossary states: "VF is the ultimate U.S. parent company, and the direct or indirect owner, of an affiliated group of global corporations."

classification are treated as occurring immediately before the close of the day before the election is effective." Petitioner reasons that its election to be disregarded "caused" the outbound F reorganization. Consequently, the constituent elements of that reorganization necessarily occurred "immediately before the close of" September 23, 2011, the day before its election to be disregarded became effective. If the constituent elements of the F reorganization all happened immediately before the close of that day, petitioner concludes, they must all have occurred simultaneously.

Again, petitioner's argument is flawed in several respects. First, the timing rule provided in Treasury Regulation § 301.7701-3(g)(3)(i) applies only to "transactions that are deemed to occur under this paragraph (g)." The transaction that would have been "deemed to occur" under Treasury Regulation § 301.7701-3(g)(1)(iii) as a result of petitioner's election to be a disregarded entity was petitioner's "distribut[ion of] all of its assets and liabilities to its single owner in liquidation." That liquidation, viewed in isolation, would have been subject to section 332, which addresses the liquidation of a subsidiary corporation into a parent corporation that owns at least 80% of the subsidiary's stock. But petitioner accepts that the transaction in issue "cannot possibly be characterized as a parent-subsidiary liquidation governed by § 332." So petitioner necessarily accepts that

the transactions "deemed to occur" in the outbound F reorganization are not those described in paragraph (g) of Treasury Regulation § 301.7701-3. Instead, because petitioner's election to be disregarded resulted in a reorganization described in section 368(a)(1)(F), the construct that would otherwise have been supplied by the entity classification regulations is superseded by a construct necessary to apply to the reorganization the operative nonrecognition provisions of sections 354 and 361.

Even when applicable, the "end-of-the-prior-day" timing rule provided in Treasury Regulation § 301.7701-3(g)(3)(i) does not treat all of the transactions "deemed to occur under . . . paragraph (g)" as having occurred simultaneously. For example, Treasury Regulation § 301.7701-3(g)(1)(i) provides: "If an eligible entity classified as a partnership elects . . . to be classified as an association, the following is deemed to occur: The partnership contributes all of its assets and liabilities to the association . . . , and immediately thereafter, the partnership liquidates by distributing the stock of the association to its partners."[16] Under Treasury Regulation § 301.7701-3(g)(3)(i) the contribution of the partnership's assets and liabilities and its distribution of the stock of the association are both

---

[16]A similar two-step construct applies when an entity classified as a corporation elects to change its classification to partnership. See Treas. Reg. § 301.7701-3(g)(1)(ii).

"treated as occurring immediately before the close of the day before the election is effective." Even so, the two steps are not treated as having occurred at the same time. The drafters of the regulation, in specifying that the partnership's liquidation occurs "immediately []after" its contribution to the corporation of its assets and liabilities, recognized that the second step could not have happened until completion of the first: The partnership could not have distributed to its partners the stock of the association until it first received that stock in exchange for its assets and liabilities. Both the contribution and the distribution may occur "immediately before the close of the day before" the partnership's election to be treated as a corporation becomes effective, but one step is more "immediately before" than the other. The distribution does not--and cannot--occur until after the contribution. The same is true of petitioner's distribution to VF Enterprises of the stock of TBL GmbH that it was treated as having received in exchange for its intangible property.

C.      Was the Disposition Within the Property's Useful Life?

Under the terms of section 367(d)(2)(A)(ii)(II), a "disposition" requires the U.S. transferor of intangible property to recognize gain when it "follow[s]" the transfer. Although a disposition after the end of the property's useful life would "follow" the transfer, it would make no sense in that circumstance to require the

U.S. transferor to recognize gain under subclause (II) after already having included in income all of the deemed annual payments contemplated by subclause (I). In recognition of that point, Temporary Treasury Regulation § 1.367(d)-1T(d)(1) requires a U.S. transferor to recognize gain under section 367(d)(2)(A)(ii)(II) upon disposing of stock of the transferee foreign corporation to a person unrelated to the U.S. transferor only if the disposition occurs "within the useful life of the intangible property." Petitioner relies on that regulation for a novel argument that, even if its distribution of TBL GmbH stock "follow[ed]" its section 367(d) transfer of intangible property, the distribution nonetheless did not require immediate gain recognition because it occurred before the intangible property's useful life began. As explained below, the authorities petitioner relies on do not support its argument.

Petitioner asserts that "[t]he useful life of property commences when the new owner places the property into service." Petitioner cites no authority specific to section 367(d) in support of that proposition. Instead, petitioner looks to a regulation dealing with depreciation allowances for intangible assets. Treasury Regulation § 1.167(a)-3 allows the cost of an intangible asset to be recovered over either 15 or 25 years. Treasury Regulation § 1.167(a)-3(b)(3) provides that a taxpayer who depreciates an intangible asset over the specified 15- or 25-year useful life "must determine the allowance by amortizing the basis of the intangible

asset . . . ratably over the useful life beginning on the first day of the month in which the intangible asset is placed in service by the taxpayer." Petitioner draws out its argument as follows:

> The reorganization transaction in issue was completed immediately before midnight on September 23, 2011[,] pursuant to a check-the-box election that was effective on September 24, 2011. Therefore, the earliest that the useful life of the Timberland Intangible Assets[17] could begin with TBL GmbH was Saturday, September 24, 2011. However, since that was a Saturday, the earliest possible placed in service date here would be Monday, September 26, 2011.

Petitioner apparently reasons that, because any distribution it made of TBL GmbH stock to VF Enterprises occurred before September 26, 2011, the distribution did not occur within the useful life of the transferred intangible property and thus cannot have required immediate gain recognition under section 367(d)(2)(A)(ii)(II).

Treasury Regulation § 1.167(a)-3 manifestly has no bearing on the useful life of intangible property for purposes of section 367(d). Treasury Regulation

---

[17]Petitioner's glossary defines "Timberland Intangible Assets" as "[t]he Timberland and SmartWool intangible assets, consisting of trademarks, customer relationships, and foreign workforce, subject to the license of the domestic rights in the intangible assets to Vans, Inc., a member of the VF Consolidated Group." In regard to "VF Consolidated Group," petitioner's glossary states: "VF is the parent of an affiliated group of domestic corporations on behalf of which it files consolidated U.S. federal income tax returns."

§ 1.167(a)-3 deals with cost recovery deductions allowable in respect of intangible assets--a question that would be irrelevant to a transferee foreign corporation that received intangible property in a section 367(d) transfer unless that foreign corporation were engaged in a U.S. trade or business or subject to the rules of subpart F of part III, subchapter N of chapter 1 of subtitle A of the Code (sections 951-965).[18] More specifically, Treasury Regulation § 1.167(a)-3 prescribes a general useful life of 15 years, although specified assets are assigned 25-year lives. By contrast, Temporary Treasury Regulation § 1.367(d)-1T(c)(3) as in effect for the taxable year in issue, provided: "For purposes of this section, the useful life of intangible property is the entire period during which the property has value. However, in no event shall the useful life of an item of intangible property be considered to exceed twenty years."[19]

---

[18]Foreign corporations are generally subject to U.S. tax at the regular graduated rates on income effectively connected with a U.S. trade or business. See § 882(a)(1). The so-called subpart F provisions require significant U.S. shareholders of "controlled foreign corporations" (CFCs) to pay current U.S. tax on investment income and other types of mostly "portable" income earned through the foreign corporations.

[19]As discussed in more detail infra part V, the apparent intent of Temporary Treasury Regulation § 1.367(d)-1T(c)(3) was to limit the period during which a U.S. transferor was required to take deemed annual payments into account under section 367(d)(2)(A)(ii)(I). Temporary Treasury Regulation § 1.367(d)-1T(c)(3) was removed and reserved by T.D. 9803, 2017-3 I.R.B. 384.

Finally, even if we were to accept that (1) a disposition requires immediate gain recognition under section 367(d)(2)(A)(ii)(II) only if it occurs after the beginning of the useful life of the transferred intangible property and (2) the useful life of the intangible property that petitioner transferred to TBL GmbH is defined by Treasury Regulation § 1.167(a)-3(b)(3), rather than Temporary Treasury Regulation § 1.367(d)-1T(c)(3), it would not follow that petitioner's distribution of TBL GmbH stock to VF Enterprises occurred before the useful life of the transferred intangible property began. Under the plain terms of Treasury Regulation § 1.167(a)-3(b)(3) the useful life of the intangible property in TBL GmbH's hands would have begun on September 1, 2011--the first day of the month in which TBL GmbH placed the property in service. Even accepting that petitioner's distribution of TBL GmbH stock occurred before the end of the day on September 23, 2011, that distribution would have occurred after the useful life of the intangible property, as defined by Treasury Regulation § 1.167(a)-3(b)(3), had already begun.[20]

---

[20]Petitioner's argument, if accepted, would mean that a U.S. transferor with the foresight to transfer intangible property late in the day on a Friday would have until the following Monday to dispose of the stock of the transferee foreign corporation without triggering gain recognition under section 367(d)(2)(A)(ii)(II). Petitioner makes no effort to explain how that prospect makes any sense.

D.    Failure of "No Disposition" Arguments To Explain Reporting

Petitioner's various arguments that any "disposition" did not occur within the relevant period share a fundamental problem:  They fail to explain the tax reporting undertaken in regard to petitioner's constructive transfer of intangible property.  Under the terms of the statute, in the absence of a "disposition following [the section 367(d)] transfer," the annual payments described in section 367(d)(2)(A)(ii)(I) are to be reported by "the United States person transferring such property."  Petitioner, then classified as a corporation, was the United States person who transferred the intangible property in issue.  Lee Bell did not transfer the intangible property that TBL GmbH acquired in the F reorganization.  Indeed, Lee Bell never owned that property.

E.    Conclusion

For the reasons explained above, we conclude that petitioner's constructive distribution to VF Enterprises of the TBL GmbH stock was a "disposition," within the meaning of section 367(d)(2)(A)(ii)(II), and that the disposition "follow[ed]" petitioner's transfer of intangible property to TBL GmbH.  Therefore, unless the regulations provide for a different result, petitioner was required to recognize its

Therefore, we would be loath to accept the argument even without regard to its several technical problems.

gain in the transferred intangible property "at the time of the disposition."

§ 367(d)(2)(A)(ii)(II).

IV.     Impact of the Regulations

We find nothing in the regulations that would allow petitioner to avoid

immediate gain recognition under section 367(d)(2)(A)(ii)(II).  Because petitioner

was no longer recognized as a separate entity for Federal tax purposes after the

completion of the F reorganization that included the section 367(d) transfer, it

could not report the deemed annual payments described in section

367(d)(2)(A)(ii)(I).  And, as explained below, no provision in the regulations

allows Lee Bell to assume responsibility for reporting those payments:  Lee Bell

was neither the U.S. transferor of the intangible property nor the recipient of the

stock of TBL GmbH, the transferee foreign corporation.

A.      Propriety of Lee Bell's Reporting

1.      Temporary Treasury Regulation § 1.367(d)-1T(c)(1)

Petitioner contends that Lee Bell's inclusion in income of deemed annual

payments was "proper[]" under the terms of Temporary Treasury Regulation

§ 1.367(d)-1T(c)(1).  That section essentially restates the annual inclusion rule of

section 367(d)(2)(A)(ii)(I).  The regulation provides:  "If a U.S. person transfers

intangible property that is subject to section 367(d) and the rules of this section to a

foreign corporation in an exchange described in section 351 or 361, then such person shall be treated as having transferred that property in exchange for annual payments contingent on the productivity or use of the property." Temp. Treas. Reg. § 1.367(d)-1T(c)(1).

Temporary Treasury Regulation § 1.367(d)-1T(c)(1) does not require or allow Lee Bell to include in income the annual payments described in section 367(d)(2)(A)(ii)(I) as a result of petitioner's constructive transfer of intangible property to TBL GmbH. As noted above, Lee Bell was not the United States person that transferred intangible property subject to section 367(d).

Petitioner contends that its interpretation of Temporary Treasury Regulation § 1.367(d)-1T(c)(1) was reasonable because "Lee Bell indirectly owned the transferred Timberland Intangible Assets and was a reasonable U.S. person to include the Annual section 367(d) Payments[21] as it was the first U.S. person that

---

[21]In regard to the term "Annual § 367(d) Payments," petitioner's glossary states:

Section 367(d) and Temp. Treas. Reg. § 1.367(d)-1T provide that in an exchange described in §§ 351 or 361 in which a United States person (U.S. transferor) transfers IP to a foreign corporation (transferee foreign corporation) the United States person transferring the IP (the U.S. transferor) will be treated as having sold the IP in exchange for payments that are contingent on the productivity, use, or disposition of the IP. The U.S. person is treated as receiving or

owned both TBL (Petitioner) and TBL GmbH." Petitioner's professedly reasonable interpretation of the regulations, however, is contrary to its plain terms. Temporary Treasury Regulation § 1.367(d)-1T(c)(1) does not require the deemed annual payments to be reported by the U.S. transferor of intangible property or, instead, a "reasonable" substitute. When applicable, it requires annual income inclusions by the U.S. transferor. Because Temporary Treasury Regulation § 1.367(d)-1T(c)(1) simply restates the statutory annual inclusion rule provided in section 367(d)(2)(A)(ii)(I), that regulation cannot be read to override the immediate gain recognition rule provided in section 367(d)(2)(A)(ii)(II). Both subclauses of section 367(d)(2)(A)(ii) must be given effect: Each is an alternative to the other. Subclause (I) requires the U.S. transferor, in the absence of a "disposition," to include in income deemed annual payments that reflect the "productivity, use, or disposition" of the transferred intangible property. § 367(d)(2)(A)(i) and (ii)(I). And subclause (II) provides that, in the event of a disposition, the U.S. transferor must recognize gain at the time of the disposition--

---

having received these amounts (I) annually over the useful life of the property (***Annual § 367(d) Payments***"), or (II) in the case of a disposition following such transfer [the temporary regulations define this as "a subsequent transfer during the transferred IP's useful life" to an unrelated person], at the time of the disposition ("***Lump-Sum Exception***").

essentially taking into account at that time the deemed payments that it would otherwise have taken into account over the remaining useful life of the transferred intangible property. § 367(d)(2)(A)(ii)(II). For petitioner to avoid immediate gain recognition, it must find a provision, applicable to its circumstances, that allows continued reporting of deemed annual payments notwithstanding its "disposition" of TBL GmbH stock. Temporary Treasury Regulation § 1.367(d)-1T(c)(1) is not that provision.

### 2. Temporary Treasury Regulation § 1.367(d)-1T(e)(3)

Petitioner also claims that Lee Bell's reporting complied with Temporary Treasury Regulation § 1.367(d)-1T(e)(3). In relevant part that section provides:

> If a U.S. person transfers intangible property that is subject to section 367(d) and the rules of this section to a foreign corporation in an exchange described in section 351 or 361, and within the useful life of the transferred intangible property, that U.S. transferor subsequently transfers any of the stock of the transferee foreign corporation to one or more foreign persons that are related to the transferor within the meaning of paragraph (h) of this section, then the U.S. transferor shall continue to include in its income the deemed payments described in paragraph (c) of this section in the same manner as if the subsequent transfer of stock had not occurred. . . .

Petitioner views it as "quite obvious[]" that Temporary Treasury Regulation § 1.367(d)-1T(e)(3) would apply if its constructive distribution of TBL GmbH stock to VF Enterprises were treated as a disposition because, it contends, VF Enterprises was "related" to petitioner. "Under the circumstances of this case,"

petitioner alleges, "the inclusion of Annual § 367(d) Payments by Lee Bell constituted compliance with Temporary Treas. Reg. § 1.367(d)-1T(e)(3)."

We disagree. Lee Bell's reporting of the deemed annual payments as a result of petitioner's section 367(d) transfer of intangible property could not have "compl[ied]" with Temporary Treasury Regulation § 1.367(d)-1T(e)(3) because-- to reiterate--Lee Bell was not the U.S. transferor of the intangible property. Under the plain terms of the regulation, it is of no consequence that Lee Bell is, in petitioner's description, "a closely related U.S. party" that might be viewed as a "reasonable proxy" for petitioner. Temporary Treasury Regulation § 1.367(d)-1T(e)(3) does not contemplate the reporting of deemed annual payments by U.S. persons who are "reasonable proxies" for the U.S. transferor.

Petitioner argues that "Temp. Treas. Reg. § 1.367(d)-1T(e)(3) . . . does not limit the inclusion of Annual § 367(d) Payments to the initial 'U.S. transferor.'" We find petitioner's reference to an "initial 'U.S. transferor'" puzzling. A section 367(d) transfer occurs only once. It can have only one U.S. transferor--not an "initial" U.S. transferor who may be replaced (or joined) by another. In specified circumstances, a U.S. person related to the U.S. transferor of intangible property in a section 367(d) exchange must assume the obligation to report the deemed annual payments described in section 367(d)(2)(A)(ii)(I). See Temp. Treas. Reg.

§ 1.367(d)-1T(e)(1). Temporary Treasury Regulation § 1.367(d)-1T(e)(1) applies when the U.S. transferor of the intangible property "transfers the stock of the transferee foreign corporation to U.S. persons that are related to the transferor within the meaning of paragraph (h) of this section." Nothing in Temporary Treasury Regulation § 1.367(d)-1T(e)(1), however, describes as a "subsequent U.S. transferor" the related U.S. person who receives the stock of the transferee foreign corporation from the "initial" U.S. transferor. Moreover, that regulation does not apply to the present case because VF Enterprises, even if "related" to petitioner within the meaning of Temporary Treasury Regulation § 1.367(d)-1T(h) was not a "U.S. person." See § 7701(a)(30) (defining "United States person" to include domestic but not foreign corporations), § 7701(a)(4) ("The term 'domestic' when applied to a corporation . . . means created or organized in the United States or under the law of the United States or of any State.").[22]

_____

[22]If petitioner's shareholder had been a U.S. person, Temporary Treasury Regulation § 1.367(d)-1T(e)(1) would have allowed petitioner to avoid immediate gain recognition under section 367(d)(2)(A)(ii)(II). Therefore, contrary to petitioner's claim, respondent's position that the section 361(c) distribution that necessarily occurs in an outbound reorganization is a "disposition" within the meaning of section 367(d)(2)(A)(ii)(II) does not mean that immediate gain recognition is required "in every outbound § 361 reorganization."

More generally, Temporary Treasury Regulation § 1.367(d)-1T(e)(3), as we read it, <u>does</u> "limit the inclusion of Annual § 367(d) Payments to the . . . 'U.S. transferor.'" When applicable, that section provides that "<u>the U.S. transferor</u> shall continue to include in its income the deemed payments described in paragraph (c) of this section." Temp. Treas. Reg. § 1.367(d)-1T(e)(3) (emphasis added). As petitioner observes, "[t]he regulation does not contain limitation language." "[I]t does not say that the income inclusion contemplated by the section can '<u>only</u> be by the U.S. transferor' or that the Annual § 367(d) Payments must be included '<u>exclusively</u> [by] the U.S. transferor." But "limitation language" of the type petitioner posits is unnecessary. When the regulation provides that, in specified circumstances, the U.S. transferor must continue to include in its income the deemed annual payments described in section 367(d)(2)(A)(ii)(I) and gives no indication that any other person would be allowed to take on that reporting obligation, the regulation should be read to "limit" the required income inclusions to the U.S. transferor.[23] As paragraph (e)(1) of Temporary Treasury Regulation

---

[23]While Temporary Treasury Regulation § 1.367(d)-1T(e)(3) does not include the limiting language petitioner imagines, it also does not provide that the deemed annual payments must continue to be reported by (1) the U.S. transferor or (2) in the event that the U.S. transferor is no longer recognized as a separate entity for Federal tax purposes following its disposition of the stock of the transferee

§ 1.367(d)-1T demonstrates, when the drafters of the regulation intended to allow or require a person other than the U.S. transferor to take on the reporting obligation they knew how to say so.

Petitioner contends that its "reasonable interpretation of Temp. Treas. Reg. § 1.367(d)-1T(e)(3), requiring Lee Bell to include the Annual § 367(d) Payments, is consistent with Respondent's administrative practice." In its motion for summary judgment, petitioner singled out Priv. Ltr. Rul. 9731039 (Aug. 1, 1997) as illustrative of that practice. Petitioner's reply to respondent's response to its motion refers to an earlier ruling: Priv. Ltr. Rul. 9024004 (June 15, 1990).

Petitioner sought to include copies of each of those rulings along with the parties' first stipulation of facts. In his motion in limine, respondent asked to "exclude" the proffered copies of the rulings. Respondent objected to the "admission" of the private letter rulings because "they are not relevant or material to any issue in the case." Respondent observes that neither ruling was issued to petitioner or addressed a transaction in which petitioner engaged. Those rulings, respondent argues, "do not have any tendency to make a fact more or less probable in Petitioner's case than it would be without such evidence."

---

foreign corporation, then by any other U.S. taxpayer of the U.S. transferor's choosing that is sufficiently related to the U.S. transferor.

We agree with respondent that "admission of . . . [the private letter] rulings into evidence is inappropriate." But respondent misunderstands petitioner's purpose in submitting copies of the rulings. As petitioner explained in its opposition to respondent's motion in limine, "these exhibits were included in the record for the Court's convenience."

On the merits, respondent reminds us, citing section 6110(k)(3), that "Private Letter Rulings may not be used or cited as precedent." We have accepted, however, that "[p]rivate letter rulings may be cited to show the practice of the Commissioner." Dover Corp. & Subs. v. Commissioner, 122 T.C. 324, 341 n.12 (2004). Even so, two private letter rulings do not an established administrative practice make. See Lucky Stores, Inc. & Subs. v. Commissioner, 153 F.3d 964, 966 n.5 (9th Cir. 1998) (declining to allow taxpayer to rely on "several private letter rulings and one technical advice memorandum"), aff'g 107 T.C. 1 (1996). Moreover, the transactions addressed in the rulings petitioner cites appear to be distinguishable from its case.

Priv. Ltr. Rul. 9731039 involved a section 355 distribution by Distributing to its shareholders of the stock of New Controlled. New Controlled was a foreign corporation that had succeeded to Controlled, a domestic corporation, in a reorganization described in section 368(a)(1)(F). Before that reorganization,

Controlled had transferred intangible property to its foreign subsidiary, Subsidiary. Among other things, the ruling held that Controlled's transfer of intangible property to Subsidiary was subject to section 367(d). It also held that "the transfer of the stock of Subsidiary from Controlled to New Controlled [in the F reorganization] is governed by § 1.367(d)-1T(e)(3)." And it held that "Distributing's distribution of its stock in New Controlled to Distributing's shareholders is governed by § 1.367(d)-1T(d) to the extent Distributing's shareholders are not related persons within the meaning of § 1.367(d)-1T(h)." Thus, in the transaction addressed in the ruling, the section 367(d) transfer of intangible property preceded the outbound F reorganization. In the outbound F reorganization, the U.S. transferor of the intangible property transferred the stock of the transferee foreign corporation that it had received in exchange for the intangible property. That transfer did not cause the U.S. transferor (Controlled) to go out of existence. If one froze the action at that point, one might say that Temporary Treasury Regulation § 1.367(d)-1T(e)(3) could apply. The U.S. transferor of the intangible property (Controlled) transferred the stock of the foreign transferee corporation (Subsidiary) to a related foreign person (New Controlled). After that specific step, Controlled could continue reporting deemed annual payments under Temporary Treasury Regulation § 1.367(d)-1T(e)(3). But

in the very next step in the outbound F reorganization, Controlled distributed to Distributing the stock of New Controlled and, in so doing, went out of existence. Thus, upon completion of the outbound F reorganization, it would no longer be possible for Controlled to continue reporting deemed annual payments. It is therefore unclear what was meant by the holding that Controlled's transfer of Subsidiary stock to New Controlled was "governed by § 1.367(d)-1T(e)(3)." Perhaps Distributing was allowed to step (momentarily) into Controlled's shoes. But Distributing promptly distributed the stock of New Controlled to its shareholders, thereby requiring the recognition of gain under section 367(d)(2)(A)(ii)(II) and Temporary Treasury Regulation § 1.367(d)-1T(d), except to the extent that a shareholder of Distributing owned enough Distributing stock to be related to Distributing. That all or most of the gain in the transferred intangible property may well have been triggered before the completion of the overall transaction renders of little consequence the prospect that Temporary Treasury Regulation § 1.367(d)-1T(e)(3) might have allowed the reporting of deemed annual payments to continue between interim steps in that overall transaction.

Priv. Ltr. Rul. 9024004 involved a transaction in which Target, a domestic corporation, transferred its assets to Acquiring, a foreign corporation, in exchange for Acquiring voting stock and Acquiring's assumption of Target's liabilities.

Target then liquidated.  The ruling held that the transaction "constitute[d] a reorganization within the meaning of section 368(a)(1)(C) of the Code."  It also held that the goodwill included among the transferred assets would be "treated as having been transferred in exchange for annual payments contingent on the productivity or use of such property" and that "[s]uch payments" would be "imputed" to Target's shareholders.  Because each of Target's three shareholders was a U.S. citizen who owned more than 10% of Target's stock, the conclusion that the shareholders could succeed to Target's obligation to report deemed annual payments was a straightforward application of Temporary Treasury Regulation § 1.367(d)-1T(e)(3).  See § 267(b)(2); Temp. Treas. Reg. § 1.367(d)-1T(h).  Petitioner alleges that "PLR 9024004 . . . shows that Respondent's consistent administrative practice was to fit transactions within the § 367(d) regulatory structure."  That the transaction addressed in Priv. Ltr. Rul. 9024004 "fit . . . within the § 367(d) regulatory structure" does not establish that any provision therein allows petitioner to avoid the recognition of gain under section 367(d)(2)(A)(ii)(II).

Petitioner also observes that, "regardless of the interpretation of the phrase 'U.S. transferor,' no language in Temporary Treas. Reg. § 1.367(d)-1T(e)(3) provides for a lump-sum inclusion."  Petitioner's observation is accurate but beside the point.  The relevant question is not whether Temporary Treasury Regulation

§ 1.367(d)-1T(e)(3) requires petitioner to include in income the excess of the fair market value of the transferred intangible property over its basis. Instead, the question is whether that regulation section or any other allows petitioner, notwithstanding its "disposition" of TBL GmbH stock, to avoid gain recognition under section 367(d)(2)(A)(ii)(II) by continued reporting of the deemed annual payments described in section 367(d)(2)(A)(ii)(I).

B. Petitioner's Inability To Comply With Temporary Treasury Regulation § 1.367(d)-1T(e)(3)

That said, Temporary Treasury Regulation § 1.367(d)-1T(e)(3), when applicable, does allow a U.S. transferor to continue reporting deemed annual payments instead of recognizing immediate gain. Moreover, the conditions for the application of that rule--at least those expressly stated--have been met in the present case. Petitioner, a U.S. person, did transfer intangible property that is subject to section 367(d) and the rules of Temporary Treasury Regulation § 1.367(d)-1T to TBL GmbH, a foreign corporation, in an exchange described in section 361. And before the end of the useful life of that property, petitioner transferred the TBL GmbH stock that it received for the property to VF Enterprises, a foreign person whom the parties seem to accept was "related" to petitioner within the meaning of Temporary Treasury Regulation

§ 1.367(d)-1T(h).[24]  Nonetheless, we conclude that Temporary Treasury Regulation § 1.367(d)-1T(e)(3) does not apply to petitioner's case.  We reach that conclusion not because of a failure to satisfy the express conditions for the rule's application but instead because the rule cannot be applied.  When applicable, Temporary Treasury Regulation § 1.367(d)-1T(e)(3) requires the U.S. transferor--

---

[24]A parent corporation and its subsidiary are related, within the meaning of Temporary Treasury Regulation § 1.367(d)-1T(h), if the parent owns at least 10% of the subsidiary's stock.  Temporary Treasury Regulation § 1.367(d)-1T(h) cross-references section 267(b), (c), and (f) in defining related persons.  Section 267(f), in turn, cross-references the "controlled group" rules of section 1563(a).  Under the controlled group rules, a parent and its subsidiary are members of the same group if the parent owns at least 80% of the subsidiary's stock.  For purposes of section 267(b)(3) and (f), however, the ownership threshold is reduced to 50%.  And for purposes of Temporary Treasury Regulation § 1.367(d)-1T(h) the threshold is further reduced, to 10%.  Temp. Treas. Reg. § 1.367(d)-1T(h)(2)(i).  Because VF Enterprises was treated as having owned all of petitioner's stock before petitioner's distribution of TBL GmbH stock, VF Enterprises was related to petitioner before the distribution.  The parties apparently agree that, at least in the circumstances of the present case, "relatedness," for purposes of Temporary Treasury Regulation § 1.367(d)-1T(h), is determined before the completion of the disposition in question.  In other circumstances, however, that approach could lead to arguably inappropriate results.  For example, a disposition of stock of the transferee foreign corporation in the form of a U.S. transferor's nonliquidating distribution of that stock to a distributee shareholder would sever the parties' relationship if the distribution were made in redemption of all of the stock in the U.S. transferor held by the distributee shareholder.  Thereafter, both the U.S. transferor and the distributee shareholder would remain in existence but would have no ongoing relationship.  In such a case, it might be inappropriate to allow continued reporting of deemed annual payments by either the U.S. transferor or distributee shareholder in lieu of immediate gain recognition.

not some other U.S. person of the taxpayer's choosing--to continue including in its income the deemed annual payments described in section 367(d)(2)(A)(ii)(I). Petitioner cannot comply with that provision because it is no longer recognized as a separate entity for Federal tax purposes.[25] By directing a U.S. transferor to "continue to include in its income the deemed payments described in paragraph (c)," Temporary Treasury Regulation § 1.367(d)-1T(e)(3) implicitly requires the U.S. transferor to remain a person with cognizable income. It is that implicit requirement that has not been met in the present case. After the deemed liquidation resulting from its election to be a disregarded entity, petitioner itself had no income in which to include the deemed annual payments.

In support of its argument that, if Lee Bell is not an acceptable substitute, it should itself be required to include in its own income the deemed annual payments described in section 367(d)(2)(A)(ii)(I), petitioner observes that "[t]here is no requirement under Temp. Treas. Reg. § 1.367(d)-1T(e)(3) that the U.S. transferor remain a U.S. entity." Strictly speaking, that is true. Nothing in the section 367(d) regulations impinged on petitioner's freedom to participate in a reincorporation in

---

[25]Petitioner argues that "[t]he U.S. transferor's continuing to include the Annual § 367(d) Payments is a result [of the application of Temporary Treasury Regulation § 1.367(d)-1T(e)(3)], not a condition." Whatever label one applies, it remains the case that petitioner is unable to comply with the regulation.

which the surviving corporation was foreign. But exercising that choice left petitioner unable to comply with Temporary Treasury Regulation § 1.367(d)-1T(e)(3). As a result of the reincorporation, petitioner ceased to exist as a recognized taxable entity and, thereafter, had no income to report.

Petitioner posits that, were it to "report" the deemed annual payments described in section 367(d)(2)(A)(ii)(I), "Lee Bell would be taxed on the same amounts that it reported directly, but . . . under Subpart F instead." We are unconvinced by petitioner's speculations about the potential impact of subpart F. Section 951(a)(1)(A) requires each "United States shareholder" of a CFC to include in its gross income its pro rata share of the CFC's "subpart F income." After petitioner distributed to VF Enterprises the TBL GmbH stock that it constructively received in exchange for its intangible property, petitioner was not a CFC. See § 957(a) (defining "controlled foreign corporation" to mean specified foreign corporations). Petitioner is no longer recognized for Federal tax purposes as any type of entity. It can no longer be required to "report" anything. Accepting that TBL GmbH is a CFC and that Lee Bell is a United States shareholder of TBL GmbH, Lee Bell would indeed be required under section 951(a)(1) to include in its

income its pro rata share of TBL GmbH's subpart F income.[26]  But Temporary

Treasury Regulation § 1.367(d)-1T(e)(3) does not authorize treating TBL GmbH as

the recipient of the deemed payments described in section 367(d)(2)(A)(ii)(I).

TBL GmbH was not the U.S. transferor in the section 367(d) transfer at issue.  It

was, instead, the transferee foreign corporation.  It was not the seller of the

intangible property but the purchaser.  Designating TBL GmbH as the recipient of

the payments deemed to be made in exchange for the transferred property would

treat it as paying itself.

---

[26]Petitioner cites no authority for the proposition that the deemed annual payments described in section 367(d)(2)(A)(ii)(I) would, if treated as received by a CFC, be included in the CFC's subpart F income.  Section 954(c)(1)(A) includes "royalties" in foreign personal holding company income, which is an element of subpart F income.  See § 952(a)(2) (providing that subpart F income includes "foreign base company income"), § 954(a)(1) (defining "foreign base company income" to include foreign personal holding company income).  While amounts described in section 367(d)(2)(A)(ii)(I) may be akin to royalties, they are expressly treated as such only "[f]or purposes of applying section 904(d)" (dealing with the foreign tax credit).  § 367(d)(2)(C).  Moreover, the subpart F income of a CFC for a taxable year is limited to the corporation's earnings and profits.  § 952(c)(1)(A). Therefore, if a CFC were treated as having received the payments described in section 367(d)(2)(A)(ii)(I), those amounts, even if included within the definition of foreign personal holding company income, would not be subpart F income for any year for which the CFC had sufficient expenses to offset them.

C.    TBL GmbH as Successor to Petitioner

Petitioner suggests that, under Temporary Treasury Regulation § 1.367(d)-1T(e)(3), TBL GmbH could be allowed or required to include in its income the deemed annual payments described in section 367(d)(2)(A)(ii)(I) because TBL GmbH is petitioner's "successor" and, "even more to the point, under the direction of section 368(a)(1)(F), is one in the same entity" as petitioner.  Petitioner contends that it "did not go out of existence" but instead merely "changed form."

In some reincorporation transactions, the identity between the old and new corporations may be so strong as to allow treating the two as a single corporation. See, e.g., Weiss v. Stearn, 265 U.S. 242 (1924) (holding that, in reincorporation in which both corporations were organized under the laws of the same State, participating shareholders realized gain only to the extent of the cash they received).  In those situations, the shareholders' exchange of stock of the old corporation for that of the new corporation would not be a realization event.  The shareholders would have no need for section 354(a)'s nonrecognition rule.  And, in that circumstance, the corporate-level nonrecognition rules provided in section 361 might be unnecessary because no transfer of assets or stock distribution need be imputed.

The transaction in which TBL GmbH acquired petitioner, however, is not of the type in which the participating entities can be viewed, for all purposes, as one and the same. See, e.g., Marr, 268 U.S. 536; Phellis, 257 U.S. 156. Because TBL GmbH was organized under the laws of Switzerland, it is "essentially different" from a limited liability company organized under the laws of Delaware that is treated as a corporation for Federal tax purposes by reason of the entity's election. See Marr, 268 U.S. at 541.[27]

D.      Temporary Treasury Regulation § 1.367(d)-1T(d)(1)

Petitioner also argues that "[t]he § 367(d) Regulations provide that a lump-sum inclusion under the Lump-Sum Exception results only where there is a

---

[27]Petitioner's "same entity" argument may rest on section 368(a)(1)(F)'s reference to "one corporation." Congress added the phrase "of one corporation" to that section to deny F reorganization treatment to fusions of two commonly owned operating corporations. The amendment was part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, § 225(a), 96 Stat. 324, 490. The TEFRA conference report describes the amendment as "limit[ing] the F reorganization definition to a change in identity, form, or place of organization of a single operating corporation." H.R. Rep. No. 97-760, at 541 (1982) (Conf. Rep.). The conferees explained: "This limitation does not preclude the use of more than one entity to consummate the transaction provided only one operating company is involved. The reincorporation of an operating company in a different State, for example, is an F reorganization that requires that more than one corporation be involved." Id. Therefore, Congress' addition of the phrase "of one corporation" to section 368(a)(1)(F) should not be understood to mean that, when an F reorganization involves two corporate entities, the successor must be treated for all purposes as one and the same as its predecessor.

subsequent transfer to an unrelated party." Petitioner apparently has in mind

Temporary Treasury Regulation § 1.367(d)-1T(d)(1), which provides:

> If a U.S. person transfers intangible property that is subject to section 367(d) and the rules of this section to a foreign corporation in an exchange described in section 351 or 361, and within the useful life of the intangible property that U.S. transferor subsequently disposes of the stock of the transferee foreign corporation to a person that is not a related person (within the meaning of paragraph (h) of this section), then the U.S. transferor shall be treated as having simultaneously sold the intangible property to the person acquiring the stock of the transferee foreign corporation. The U.S. transferor shall be required to recognize gain (but not loss) from sources within the United States in an amount equal to the difference between the fair market value of the transferred intangible property on the date of the subsequent disposition and the U.S. transferor's former adjusted basis in that property (determined as of the original transfer). . . .

Contrary to petitioner's description, Temporary Treasury Regulation

§ 1.367(d)-1T(d)(1) does not provide that a U.S. transferor recognizes gain upon a

disposition of the stock of the transferee foreign corporation <u>only</u> if that disposition

is to an unrelated party. Instead, it says that <u>when</u> the disposition is to an unrelated

party, the U.S. transferor must recognize gain. Temporary Treasury Regulation

§ 1.367(d)-1T(d)(1) says nothing about the consequences of a U.S. transferor's

disposition of the stock of the transferee foreign corporation to a related person.

Those dispositions are addressed elsewhere in the regulations--in particular,

Temporary Treasury Regulation § 1.367(d)-1T(e)(1) and (3). As explained above,

subparagraph (1) does not apply to petitioner's case and petitioner cannot comply with the mandate of subparagraph (3).

E.    Notice 2012-39

Petitioner suggests that "Respondent's position in this case" "is directly at odds" with a notice respondent issued in 2012. Notice 2012-39, § 1, 2012-31 I.R.B. 95, 95, announced plans for the issuance of regulations to address "significant policy concerns" about outbound reorganizations that involve transfers of intangible property.[28] According to the notice, the forthcoming regulations would "apply to transfers occurring on or after July 13, 2012." Id. The notice goes on to state: "No inference is intended as to the treatment of transactions described in this notice under current law, and the IRS may challenge such transactions under applicable Code provisions or judicial doctrines." Id. § 5, 2012-31 I.R.B. at 98.

The notice describes the transactions of concern as having the "inten[t] to repatriate earnings from foreign corporations without the appropriate recognition of income." Id. § 3, 2012-31 I.R.B. at 96. Among the examples given of those transactions are "cases in which a controlled foreign corporation uses deferred

---

[28]A copy of Notice 2012-39 that petitioner sought to include with the parties' first stipulation of facts is also covered by respondent's motion in limine and motion to strike.

earnings [an apparent reference to earnings not previously subject to U.S. tax] to fund an acquisition of all or part of the stock of a domestic corporation from an unrelated party for cash, followed by an outbound asset reorganization of the domestic corporation to avoid an income inclusion under section 956."[29] Id.

Under one of the rules that would be added to the regulations, the U.S. transferor of intangible property would "take into account income under section 367(d)(2)(A)(ii)(II)" to the extent that the stock of the transferee foreign corporation that the U.S. transferor distributes in the reorganization is received by "non-qualified successors." Id. § 4.03. For that purpose, foreign corporations, individuals, and some domestic corporations subject to special tax treatment would be nonqualified successors. Id. § 4.07, 2012-31 I.R.B. at 97. Therefore, if a domestic target corporation, after being acquired by a CFC, transferred intangible property in a subsequent outbound reorganization, the target would recognize immediate gain under section 367(d)(2)(A)(ii)(II) because its shareholder, as a foreign corporation, would be a nonqualified successor.

If the rules announced in Notice 2012-39, supra, had applied to the outbound F reorganization in which petitioner constructively transferred intangible property

---

[29]Under section 956, investments in U.S. property by CFCs generally result in deemed repatriation of the CFC's earnings.

to TBL GmbH, petitioner would clearly have been required to recognize gain under section 367(d)(2)(A)(ii)(II) as a result of the transfer. Its shareholder, VF Enterprises, was a foreign corporation and, thus, a "non-qualified successor" within the meaning of the notice. Respondent asserts that the same result obtains under the law in effect during 2011. If that were so, petitioner reasons, respondent would have had no need to issue Notice 2012-39, supra.[30]

As respondent observes, however, the notice's scope extends well beyond transactions such as petitioner's. For example, the notice addresses situations in which the outbound reorganization involves the payment of boot. Even the specific rule that would address transactions like petitioner's--applicable to U.S. transferors owned by nonqualified successors--would apply to circumstances beyond those of the present case. The nonqualified successor rule would require the recognition of gain not only by U.S. transferors, like petitioner, owned by foreign corporations but also those owned by individuals. (The notice reflects the view that the tax paid by individual shareholders deemed to receive annual payments described in section 367(d)(2)(A)(ii)(I) would not be an adequate

---

[30]In effect, petitioner asks us to draw inferences about the state of the law before the IRS' issuance of Notice 2012-39, supra, notwithstanding the customary "no inference" disclaimer included in the notice.

substitute for the corporate-level tax that would, in the absence of a disposition, have been paid by the U.S. transferor.)  Therefore, the pending amendments to the regulations announced in Notice 2012-39, supra, would have been necessary, at least in part, even it if it had already been clear that a transfer of intangible property in an outbound reorganization by a U.S. transferor owned by a foreign corporation requires the recognition of gain under section 367(d)(2)(A)(ii)(II).  The notice's inclusion of foreign corporations in the definition of "non-qualified successor" could have either restated existing law or addressed an issue on which existing law was uncertain.[31]

_____

[31]For similar reasons, we decline to draw the inferences petitioner would have us draw from the Office of Tax Policy/IRS business plans that are among the documents covered by respondent's motion in limine and motion to strike.  As explained supra part II.C, petitioner views those documents as relevant primarily to support an inference regarding the purposes behind the timing of the adoption of Treasury Regulation § 1.367(a)-1(f) in final form.  In its opposition to respondent's motion in limine, however, petitioner suggests that the proffered business plans are also relevant because they include regulations under section 367(d) among the priority guidance projects.  Petitioner presumes that "Regulations under consideration . . . would include regulations identified as necessary by Notice 2012-39."  The announced plans for future guidance, petitioner reasons, "also support[] that § 367(d) Regulations are needed to achieve Respondent's litigating position in this case, and that Treas. Reg. § 1.367(a)-1(f) is insufficient to reach the result Respondent seeks."  To the extent that the intended regulations would address petitioner's transaction and, in particular, would require the recognition of immediate gain upon the U.S. transferor's distribution of the stock of the transferee foreign corporation, those regulations could be understood as simply confirming-- or at least resolving uncertainty in--current law.

In short, petitioner's task, again, is to identify one or more provisions of the regulations that allow it to avoid gain recognition under section 367(d)(2)(A)(ii)(II) notwithstanding its disposition of TBL GmbH stock. Its invocation of Notice 2012-39, supra, does not accomplish that task. The notice does not give us grounds to conclude that the law in effect before its issuance allowed petitioner to avoid gain recognition by means of reporting of deemed annual payments by Lee Bell, TBL GmbH, or any other person or entity recognized for Federal tax purposes.

F.     New York State Bar Association Tax Section Report

Finally, petitioner suggests that a 2010 report on section 367(d) prepared by the New York State Bar Association Tax Section (NYSBA report) "supports . . . [its] reporting position." See N.Y. State Bar Ass'n (NYSBA), Report on Section 367(d) (2010). As we read the NYSBA report, however, it does not support the specific reporting undertaken in respect of the transaction at issue in this case--that is, Lee Bell's inclusion in income of deemed annual payments under section 367(d)(2)(A)(ii)(I). The NYSBA report does take the position that immediate gain recognition should not be required in the case of an outbound reorganization involving a transfer of intangible property by a U.S. corporation owned by a CFC

parent. As explained below, however, we find unpersuasive the analysis offered in the report in support of that conclusion.

Before turning to the merits of the report's recommendation, we first address the more general question of its status as authority. Petitioner sought to include a copy of the NYSBA report as part of the parties' first stipulation of facts. Respondent dismisses the report as "not authoritative, binding, or otherwise dispositive" and, in his motion in limine, asks us to disregard the report. Petitioner responds that it "never claim[ed] the NYSBA Report is binding, but rather that it is a type of persuasive authority that courts may look to and that it warrants consideration by this Court."

In his motion in limine, respondent accepts that the NYSBA report "should be viewed as secondary legal authority." He seeks only to strike the report "as factual evidence." But petitioner's purpose in submitting the report was not to establish any fact relevant to the case. As petitioner explains in its opposition to respondent's motion to strike, it "attached the NYSBA Report to . . . [the parties' first stipulation of facts] for the Court's convenience." We will therefore consider the report as secondary authority to the extent that it may assist us in resolving the legal dispute before us.

The parties offer competing interpretations of the NYSBA report, with each claiming that the report supports its or his own position. It seems clear that the drafters of the report believed that a domestic target corporation acquired in an outbound reorganization should not be required to recognize immediate gain under section 367(d)(2)(A)(ii)(II) as a result of its distribution of stock of the transferee foreign corporation if the domestic target is owned by a CFC that, in turn, is owned entirely by United States shareholders who would be required to include in their income their ratable shares of the CFC's subpart F income. It is less clear, however, whether, in that respect, the report reflects the drafters' understanding of then-current law or, instead, their recommendation that new regulations be issued to achieve that result.

The drafters begin by acknowledging that "[t]he Temporary Section 367(d) Regulations do not specifically address what happens if the U.S. transferor goes out of existence, either in connection with the Section 367(d) transfer or after the transfer." NYSBA, supra, at 76. The drafters then consider an outbound reorganization in which a domestic target corporation is owned by a U.S. parent corporation. If the transferred assets include intangible property, the drafters reason, "it should be clear that the U.S. parent should be required to continue to include deemed Section 367(d) income as a result of the outbound transfer of

Section 936 Intangibles over the life of such Intangibles." Id. at 77. That

conclusion reflects a relatively straightforward application of Temporary Treasury

Regulation § 1.367(d)-1T(e)(1). If the U.S. parent is viewed as a person "related"

to the U.S. transferor, on the basis of the relationship that existed before the U.S.

transferor's dissolution, the U.S. parent can step into the shoes of the U.S.

transferor and report the deemed annual payments described in section

367(d)(2)(A)(ii)(I).

The NYSBA report then considers the consequences of an outbound

reorganization of a domestic target owned by a foreign corporation:

> Somewhat more complicated is the situation where a U.S. target
> owned by a foreign corporation effects an outbound . . . reorganization
> of Section 936 Intangibles. In the easier case, assume U.S. Target is
> owned by a controlled foreign corporation ("CFC") subject to Subpart
> F. As a statutory construction matter, we would think that Section
> 367(d) displaces Section 367(a) only for U.S. Target's transfer of a
> Section 936 Intangible to the foreign transferee. U.S. Target's
> subsequent distribution to its parent of the transferee's stock in
> liquidation should be eligible for non-recognition under Section
> 361(c) and Section 367(a)(2).[32] Accordingly, a tax free distribution
> of the transferee's shares should be available to the U.S. target's
> CFC/parent. The CFC/parent as successor to U.S. Target's attributes
> under Section 381(c) would succeed to and recognize subsequent
> Section 367(d) inclusions over the useful life of the transferred
> Section 936 Intangibles or until it ceased to be a CFC. In the case of a

---

[32]Section 367(a)(2) provides generally that the gain recognition rule of section 367(a)(1) "shall not apply to the transfer of stock or securities of a foreign corporation which is a party to the exchange or a party to the reorganization."

CFC, this analysis preserves the widest ambit for Section 367(d) to operate and avoids allowing taxpayers to elect current recognition and elect out of Section 367(d) by such related person transfers.

However, in the case of a foreign parent corporation that is not a CFC (or to the extent the foreign parent corporation's shareholders are not U.S. Shareholders within the meaning of Section 951(b)), continuation of the Section 367(d) regime would ensure that Section 367(d) income would be taxable. For example, existing Regulation § 1.367(d)-1T(e)(3) provides that, in the case of subsequent transfers of shares bearing a Section 367(d) obligation to a related CFC, only the continuing U.S. transferor continues absorbing the Section 367(d) inclusions. Accordingly, new regulations could provide, with respect to an outbound . . . reorganization in which the transferor of Section 936 Intangibles goes out of existence in connection with the transaction, that the transferor is taxed currently on its gain as in the case of a terminating disposition under Section 367(d)(2)(A)(ii) unless the distributee is domestic or, if foreign, is, e.g., a CFC more than 80% of whose shares are held by U.S. shareholders, in which case the distributee would continue recognition of Section 367(d) inclusions.

NYSBA, supra, at 78-79 (footnote omitted).

Petitioner, apparently referring to the first paragraph quoted above, observes that "the NYSBA Report . . . concluded that a transaction very similar to the one at issue does not require a lump-sum inclusion." More specifically, petitioner contends that the report "supports Lee Bell's inclusion of Annual § 367(d) Payments."

Focusing on the second of the above-quoted paragraphs, respondent interprets the NYSBA report as "saying that the regulations could--but presently do not--provide an exception to immediate reporting for a situation like Petitioner's."

Thus, respondent concludes that "a close reading of the . . . report demonstrates that it actually confirms that Respondent's position is correct."

We are inclined to accept petitioner's interpretation of the NYSBA report. The first of the quoted paragraphs concludes, on the basis of statutory interpretation, that a target corporation's distribution of stock of the transferee foreign corporation to a CFC parent does not require the recognition of immediate gain under section 367(d)(2)(A)(ii)(II). The report's reference to possible new regulations in the second paragraph is unclear. Would those regulations be necessary to require the recognition of gain on a liquidating distribution of stock of the transferee foreign corporation or instead to provide that immediate gain recognition is not required when the distribution is to a CFC a sufficient portion of whose stock is owned by United States shareholders who would be required to include in income their respective shares of the CFC's subpart F income? Even if the hypothesized regulations would serve the latter purpose--providing an exemption from the recognition of immediate gain that would otherwise be required--the drafters may have envisioned those regulations as simply confirming their interpretation of the statutory provisions they viewed as governing.

Even so, the NYSBA report does not support the specific reporting undertaken to reflect the transaction in issue. The report posits that, when a U.S.

target owned by a CFC transfers intangible property in an outbound reorganization, the target's CFC parent should assume the obligation to report the deemed annual payments described in section 367(d)(2)(A)(ii)(I). In the present case, that would be VF Enterprises. By contrast, Lee Bell--a U.S. corporation other than petitioner's CFC parent--voluntarily reported deemed annual payments--apparently not as its share of subpart F income of VF Enterprises but as income of Lee Bell in its own right. In support of its motion for summary judgment, petitioner suggested the alternative possibility of TBL GmbH reporting deemed annual payments as petitioner's successor. But that approach would differ from the one recommended by the NYSBA report.

Leaving those details aside, we accept that the drafters of the NYSBA report concluded by means of statutory analysis that a U.S. target's distribution to a CFC parent of stock of the transferee foreign corporation as part of an outbound reorganization should not require immediate gain recognition under section 367(d)(2)(A)(ii)(II). To the extent that that analysis supports petitioner's position, however, we find it unpersuasive. The drafters' conclusion rests on the premise that, while section 367(d) can override section 361(a) (the nonrecognition rule applicable to transfers of assets), it should not be interpreted to override section 361(c) (the nonrecognition rule that applies to distributions of the stock received in

exchange for transferred assets). While we agree with that premise, it does not support the drafters' conclusion. Treating the target's distribution of stock of the transferee foreign corporation as the trigger for the recognition of gain in the transferred intangible property would not affect the nonrecognition treatment afforded by section 361(c) on the distribution of stock. The stock distribution itself would remain eligible for nonrecognition treatment. The occurrence of that nonrecognition event would simply determine when the gain on the transferred intangible property must be recognized.

Moreover, the drafters of the NYSBA report erred in another respect in their reading of the statutes they relied on. They suggest that section 381(c) supports having the parent of the target corporation assume responsibility for the reporting of the deemed annual payments described in section 367(d)(2)(A)(ii)(I). Section 381 does provide for the carryover of the tax attributes of a target corporation acquired in specified types of reorganizations, including one described in section 368(a)(1)(F). But the entity that succeeds to those attributes is not the target's parent corporation (if any), but instead the acquiring corporation.[33] And, as

_____

[33]Sec. 381(a). General rule.--In the case of the acquisition of assets of a corporation by another corporation--

. . . .

explained supra part IV.B, it would make no sense to have the acquiring corporation in the reorganization (the transferee foreign corporation) assume responsibility for reporting the payments described in section 367(d)(2)(A)(ii)(I). Doing so would treat that corporation as making payments to itself, as simultaneously buyer and seller of the transferred intangible property.

In short, we do not agree that, "[a]s a statutory construction matter," a U.S. transferor of intangible property in an outbound reorganization is not required to recognize gain under section 367(d)(2)(A)(ii)(II) if that corporation was (before its dissolution) owned by a CFC and that, instead, the CFC parent should be required to include in income the deemed annual payments described in section 367(d)(2)(A)(ii)(I). On the contrary, for the reasons explained supra part III.A, the U.S. transferor's distribution of the stock of the transferee foreign corporation is a "disposition" within the meaning of section 367(d)(2)(A)(ii)(II). Therefore, the distribution will require the U.S. transferor to recognize any gain in intangible property transferred in pursuance of the plan of reorganization in the absence of a

---

> (2) in a transfer to which section 361 . . . applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D), (F), or (G) of section 368(a)(1),
>
> the acquiring corporation shall succeed to and take into account . . . the items described in subsection (c) of the . . . transferor corporation . . . .

rule in the regulations providing contrary treatment. The NYSBA report identifies no provision in the regulations that would allow reporting of deemed annual payments notwithstanding the U.S. transferor's "disposition" of the stock of the transferee foreign corporation.

G.    Conclusion

For the reasons explained supra part III, we have concluded that petitioner's constructive distribution to VF Enterprises of the TBL GmbH stock that petitioner constructively received in exchange for its intangible property was a "disposition" within the meaning of section 367(d)(2)(A)(ii)(II). We also conclude, for the reasons explained in this part IV, that no provision of the regulations allows petitioner to avoid the recognition of gain under that statutory provision.

Petitioner suggests that respondent is to blame for the absence of a provision in the regulations that can be applied to petitioner's circumstances. The absence of an applicable regulatory provision, however, requires that we look to the statute alone to determine the tax consequences of petitioner's transaction. For the reasons explained supra part III, section 367(d)(2)(A)(ii)(II), interpreted in accordance with the legislative history, requires petitioner to recognize gain. The absence of a provision in the regulations providing otherwise is petitioner's problem--not respondent's.

Because respondent's position is grounded in an interpretation of the applicable statutory provisions and not on any regulations, we do not understand petitioner's argument that respondent's "litigating position" is "impermissible" under Bowen v. Georgetown University Hospital, 488 U.S. 204 (1988). Bowen stands for the proposition that an agency's litigating position is not entitled to the same deference a court would give to a position adopted through notice and comment rulemaking. See id. at 212-13; see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). Respondent does not ask that we grant Chevron deference to the interpretation of the applicable statutes that he advances in this case.

In support of its efforts to cast disfavor on respondent's litigating position, petitioner asks us to consider facts concerning the examination of its return for the year in issue. In the memorandum it submitted in support of its motion for summary judgment, petitioner proposed a finding to the effect that the team initially assigned to the examination "did not make an adjustment for Petitioner to include immediate lump-sum gain under § 367(d)(2)(A)(ii)(II) or Temp. Treas. Reg. § 1.367(d)-1T." Respondent does not contest the accuracy of that proposed finding but nonetheless objects to it as "irrelevant, vague, [and] misleading." In addition, respondent has asked us to strike the declaration of a former VF

employee that petitioner submitted in support of its proposed findings concerning the circumstances of the examination. Petitioner cites no authority for the proposition that views expressed during the course of the audit bind respondent for purposes of the present litigation.

Petitioner suggests that the disputed evidence demonstrates that the position respondent now advances "was not foreseeable." The extent to which a taxpayer might have been subjectively surprised by a position advanced by the Commissioner has no direct bearing, however, on the position's merits. Moreover, as the NYSBA report acknowledges, the regulations "do not specifically address" cases like petitioner's, in which a U.S. transferor of intangible property "goes out of existence" in the act of disposing of the stock of the transferee foreign corporation. Petitioner chose to carry out a transaction in regard to which the law was, at best, uncertain. In doing so, it necessarily assumed the risk of an outcome that, by its lights, would be unfavorable.[34]

---

[34]Petitioner repeatedly invokes our observation in <u>Xilinx Inc. & Consol. Subs. v. Commissioner</u>, 125 T.C. 37, 62 (2005), <u>aff'd</u>, 598 F.3d 1191 (9th Cir. 2010), that taxpayers "are merely required to be compliant, not prescient." We made that observation, however, in regard to a position advanced by the Commissioner that was contrary to governing regulations.

We are left with one task remaining. Having determined that petitioner must recognize gain for the taxable year in issue by reason of the application of section 367(d)(2)(A)(ii)(II), we now determine the amount of that gain.

V.     Amount of Required Income Inclusion

The parties agree on the amount of income inclusion required under section 367(d)(2)(A)(ii)(II) by reason of petitioner's transfer of foreign workforce and foreign customer relationships. They have stipulated that, "[i]f the Court decides that a lump-sum inclusion of income is required under I.R.C. § 367(d)(2)(A)(ii)(II), then Petitioner's increase in income for the transfer of the foreign workforce and the foreign customer relationships would be $23,400,000 and $174,400,000, respectively." The parties agree only in part, however, as to the income inclusion required by reason of petitioner's transfer of trademarks. As to that question, their stipulation states:

> If the Court decides that a lump-sum inclusion of income is required under I.R.C. § 367(d)(2)(A)(ii)(II), then Petitioner's increase in income for the transfer of the trademarks is $1,274,100,000, unless the Court agrees to reduce the adjustment to income for the trademarks based on a 20-year useful life limitation, pursuant to Temp. Treas. Reg. § 1.367(d)-1T, in which case the increase in income for the transfer of the trademarks is $1,029,200,000, in each case less the reported trademark basis of $19,339,000.

Thus, the parties apparently agree that the income inclusion required by section 367(d)(2)(A)(ii)(II) is the excess of the fair market value of the transferred

intangible property at the time of petitioner's disposition of the TBL GmbH stock over the basis of that property. <u>Cf.</u> Temp. Treas. Reg. § 1.367(d)-1T(d)(1). They also agree on the values of the foreign workforce and customer relationships that petitioner constructively transferred to TBL GmbH. And they agree as to petitioner's tax basis in the transferred property. And, finally, they agree on the resolution of the factual question of the trademarks' value under two alternative legal assumptions. Their point of disagreement is whether, as a matter of law, the fair market value of the trademarks must be determined by treating each as having a useful life of no more than 20 years. That legal question, which petitioner raised in an amendment to its petition, arises by reason of Temporary Treasury Regulation § 1.367(d)-1T(c)(3), which, as in effect for 2011, provided: "For purposes of this section, the useful life of intangible property is the entire period during which the property has value. However, in no event shall the useful life of an item of intangible property be considered to exceed twenty years."

Petitioner argues: "If this Court determines that a subsequent transfer occurred resulting in a lump-sum inclusion amount under the Lump-Sum Exception, Temp. Treas. Reg. § 1.367(d)-1T(c)(3) requires that the inclusion be calculated with a 20-year useful life limitation." Respondent counters that section 367(d)(2)(A)(ii)(II) "makes no reference whatsoever to 'useful life' of the

transferred property." Respondent characterizes Temporary Treasury Regulation § 1.367(d)-1T(c)(3) as a "regulatory grace applicable to the annual inclusion paradigm." According to respondent: "Petitioner cannot rely on an administrative limitation on the time period over which annual inclusions would be taken into account for purposes of reducing its disposition rule amount. The 20-year regulatory limitation on the annual inclusion period is not a substitute methodology overriding settled law concerning the definition of fair market value." In that regard, respondent points to Temporary Treasury Regulation § 1.367(d)-1T(g)(5), which provides: "For purposes of determining the gain to be recognized immediately under paragraph (d), (f), or (g)(2) of this section, the fair market value of transferred property shall be the single payment arm's-length price that would be paid for the property by an unrelated purchaser determined in accordance with the principles of section 482 and regulations thereunder." Finally, respondent suggests that imposing an "artificial limitation" on the value of transferred intangible property would frustrate Congress' purpose in enacting section 367(d). "Because the limitation on useful life in Temp. Treas. Reg. § 1.367(d)-1T(c)(3) could only have the effect of reducing the amount that would be taxed pursuant to Congress's intentions under section 367(d)," respondent reasons, "the limitation should be read narrowly and applied only to the circumstances specified in the

regulations, i.e., annual inclusions and the time frame within which the intangible property must be transferred to trigger [section 367(d)(2)(A)(ii)(II)]."

In response to respondent's argument, petitioner observes that "Temp. Treas. Reg. § 1.367(d)-1T(c)(3) does not state that it only applies to Annual § 367(d) Payments." Instead, paragraph (c)(3) of Temporary Treasury Regulation § 1.367(d)-1T provided that it applied "[f]or purposes of this section." Petitioner notes that a property's useful life is a relevant factor in determining its fair market value and insists that "the regulations require a 20-year time frame for all useful life analyses."

Our conclusion that petitioner must recognize gain as a result of its constructive transfer of intangible property to TBL GmbH does not rest on any provision in Temporary Treasury Regulation § 1.367(d)-1T. The only rule in that section of the regulations that requires the recognition of gain upon a disposition of stock of the transferee foreign corporation applies when that disposition is to a person unrelated to the U.S. transferor. Temp. Treas. Reg. § 1.367(d)-1T(d)(1). We have accepted the parties' apparent view that VF Enterprises was related to petitioner within the meaning of Temporary Treasury Regulation § 1.367(d)-1T(h). Consequently, Temporary Treasury Regulation § 1.367(d)-1T(d)(1) is not the basis for our conclusion that petitioner must recognize gain in the transferred intangible

property as a result of its constructive distribution to VF Enterprises of TBL GmbH stock. Instead, our conclusion rests on the statutory gain recognition rule provided in section 367(d)(2)(A)(ii)(II).

Accordingly, we might dismiss petitioner's argument on that ground that, regardless of the extent to which Temporary Treasury Regulation § 1.367(d)-1T(c)(3) applies in implementing other rules of that section of the regulations, it does not apply when gain recognition is required by the statute and the statute alone. Under that analysis, however, a U.S. transferor who disposes of stock of the transferee foreign corporation to a related person and, in so doing, goes out of existence might be required to recognize gain in a greater amount than if the disposition had been to an unrelated person. That distinction would be unsupported by any apparent policy grounds. Therefore, we will accept that, if the 20-year useful life limitation imposed by Temporary Treasury Regulation § 1.367(d)-1T(c)(3) can limit the amount of gain required to be taken into account under Temporary Treasury Regulation § 1.367(d)-1T(d)(1) upon a disposition of the stock of the transferee foreign corporation to a person unrelated to the U.S. transferor, it should also reduce the amount of gain petitioner is required to take into account under the statutory gain recognition rule of section 367(d)(2)(A)(ii)(II).

As petitioner emphasizes, paragraph (c)(3) applied, by its terms, "[f]or purposes of" Temporary Treasury Regulation § 1.367(d)-1T. We therefore ask: For what other provisions within Temporary Treasury Regulation § 1.367(d)-1T is the useful life of transferred intangible property relevant? "[U]seful life" appears seven times in provisions of that section, as in effect during 2011, other than paragraph (c)(3). Each of those instances has to do with the period during which (1) deemed annual payments must be taken into account and (2) a direct or indirect disposition of the transferred intangible property can require the recognition of gain.[35] The provisions that require or allow the recognition of gain refer to the fair

_____

[35]Temporary Treasury Regulation § 1.367(d)-1T(a), captioned "Purpose and scope," states the general rule that, as a result of a transfer of intangible property to which section 367(d) applies, "the U.S. transferor will be treated as receiving annual payments contingent on productivity or use of the transferred property, over the useful life of the property (regardless of whether such payments are in fact made by the transferee)." Temporary Treasury Regulation § 1.367(d)-1T(c)(1) in restating that general rule, again refers to the property's useful life. Temporary Treasury Regulation § 1.367(d)-1T(d)(1) requires the U.S. transferor to recognize gain upon disposing of the stock of the transferee foreign corporation to an unrelated person if the disposition occurs "within the useful life of the intangible property." Temporary Treasury Regulation § 1.367(d)-1T(e)(1) applies if the disposition of the stock of the foreign transferee corporation "within the useful life of the transferred intangible property" is to a related U.S. person. In that event, the related U.S. person must include deemed annual payments in income "over the useful life of the property." Temp. Treas. Reg. § 1.367(d)-1T(e)(1)(ii). Temporary Treasury Regulation § 1.367(d)-1T(e)(3) applies when the disposition of transferee foreign corporation stock, "within the useful life of the transferred intangible property," is to a related foreign person. And Temporary Treasury Regulation

market value of the intangible property but do not expressly make the property's useful life relevant in determining that value. If the 20-year useful life limitation applies for that purpose, it does so only implicitly.

Any implication that the useful life limitation imposed by Temporary Treasury Regulation § 1.367(d)-1T(c)(3) might apply in determining the amount of gain that must be recognized under paragraph (d)(1) would conflict with the definition of "fair market value" provided in paragraph (g)(5). As respondent observes, Temporary Treasury Regulation § 1.367(d)-1T(g)(5) provides that the fair market value of transferred property is the amount that an unrelated purchaser would pay for the property. Temporary Treasury Regulation § 1.367(d)-1T(g)(5) expressly applies "[f]or purposes of determining the gain . . . recognized immediately under paragraph (d), (f), or (g)(2)" of Temporary Treasury Regulation § 1.367(d)-1T.[36] In an arm's-length transaction, an unrelated purchaser of intangible property would consider the entire period during which the property would have value in determining the price it would pay for the property. The

---

§ 1.367(d)-1T(f)(1) requires the recognition of gain if the transferee foreign corporation, "within the useful life of the intangible property," transfers that property to an unrelated person.

[36]Temporary Treasury Regulation § 1.367(d)-1T(g)(2) allows a U.S. transferor of intangible property to a foreign corporation, under specified circumstances, to elect immediate gain recognition.

terms of paragraph (g)(5), which specifically and expressly govern the determination of the fair market value of intangible property for the purpose of determining gain that must be recognized under an immediate gain recognition rule must take precedence over possible implications of a more general provision regarding the property's useful life. As petitioner recognizes, "[s]pecific regulations govern over general regulations."

Petitioner admits that $1,029,200,000 is not "the full fair market value" of the trademarks it constructively transferred to TBL GmbH. Petitioner acknowledges that the values it reported on its Form 926, including the $1,274,100,000 value assigned to the trademarks, were "the fair market values of the Timberland Intangible Assets . . . without the application of the regulations' useful life limitation." Petitioner reported those amounts, it explained, because "Form 926 states that the full fair market value be stated on the form."

By contrast, petitioner offers us no explanation for why the drafters of Temporary Treasury Regulation § 1.367(d)-1T might have intended that the amount of gain a U.S. transferor is required to recognize upon a direct or indirect disposition of transferred intangible property should be computed on the basis of a value that is less than the property's "full fair market value." The useful life limitation provided in Temporary Treasury Regulation § 1.367(d)-1T(c)(3), when

applicable, allowed a U.S. transferor to recognize less than the full amount of gain in intangible property transferred to a foreign corporation. As applied to the requirement to report deemed annual payments, the useful life limitation could have been understood as a rule of administrative convenience. And it follows that a U.S. transferor should not be required to recognize gain upon a direct or indirect disposition of the intangible property that occurs after all required annual deemed payments have been taken into account. Applying the 20-year useful life limitation to limit the amount of gain recognized upon a disposition before all deemed annual payments have been reported, however, cannot be understood as a rule of convenience. Allowing the U.S. transferor, in that circumstance, to avoid recognizing the full amount of gain in the transferred intangible property would have no apparent justification. If the drafters of Temporary Treasury Regulation § 1.367(d)-1T had intended that result, we would have expected them to have been more explicit.

Therefore, we decline to apply Temporary Treasury Regulation § 1.367(d)-1T(c)(3) beyond the purposes for which it was expressly relevant (that is, for purposes of applying other provisions of the regulations that explicitly refer to the intangible property's "useful life"). By reason of Temporary Treasury Regulation § 1.367(d)-1T(g)(5), the gain that a U.S. transferor must recognize under paragraph

(d)(1) upon disposing of the stock of the transferee foreign corporation to an unrelated person should take into account the actual fair market value of the transferred intangible property on the date of the disposition.  That fair market value should reflect the amount that an unrelated purchaser would pay for the property in an arm's-length transaction, taking into account the entire period during which the property may be expected to have value.

Because we do not "agree[] to reduce the adjustment to income for the trademarks based on a 20-year useful life limitation, pursuant to Temp. Treas. Reg. § 1.367(d)-1T," we determine, in accordance with the parties' stipulation, that "[p]etitioner's increase in income for the transfer of the trademarks is $1,274,100,000."  Adding that figure to the agreed value of the foreign workforce and customer relationships that petitioner transferred to TBL GmbH and reducing the sum by the agreed trademark basis, we conclude that petitioner's income for the taxable year in issue should be increased by $1,452,561,000 ($1,274,100,000 + $23,400,000 + $174,400,000 − $19,339,000), as determined in the notice of deficiency.  Because petitioner did not assign error to the other two adjustments reflected in the notice of deficiency, it follows that respondent is entitled to judgment as a matter of law.  Accordingly, we will grant respondent's motion for

summary judgment and deny petitioner's corresponding motion.  We will also deny as moot respondent's motion in limine and motion to strike.

An appropriate order will be issued, and decision will be entered for respondent.